UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-115 (KMM/DTS)

UNITED STATES OF AMERICA,

            Plaintiff,

    v.

ISAAC SANT, ET AL.,

            Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENSE'S MOTION TO MODIFY CONDITIONS OF RELEASE**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Special Assistant United States Attorney Sommer Honeycutt, hereby consolidates its response and objects to the defense motions to modify conditions of release.

The Defendants that have filed a request to modify conditions of release are Defendant Doyle, Morgan, Misterek, Rakotz, Stewart, Davis, Kim, Thoreson, Kennedy, Beisell and Apland (herein referred to as "Defendants" or individually by last name).

## ISSUE PRESENTED

Is the no-contact order between Defendants pursuant to 18 U.S.C. Section 3142(c)(1)(B)(v), conditions of release, too broad thereby impinging on Constitutional rights of the Defendants?

## SHORT ANSWER

While courts caution against sweeping restrictions on Constitutional rights, even under pre-trial release, narrowly tailored restrictions are appropriate, valid and

help courts safeguard proceedings under 18 U.S.C. Section 3142 during pre-trial release.

## FACTS

The Defendants that have filed a request to modify conditions of release are Defendants Doyle, Morgan, Misterek, Rakotz, Stewart, Davis, Kim, Thoreson, Kennedy, Beisell and Apland (herein referred to as just "Defendants" or individually just by last name). In particular, the defendants are requesting the ability to have contact between each other outside of the presence of their lawyers.

### Initial Appearances

On June 16, 2026, all defendants in *Sant et. al.* appeared for their initial court appearance where they were released on pre-trial conditions. The government asked for no contact between co-defendants. *See* Initial App. Tr. 27. Counsel for the government offered exhibits 1-20 supporting the Indictment returned by the grand jury. Initial App. Tr. 40. Counsel went on to relate how the exhibits show the hard and soft blockades places around the Whipple building on January 23, 2026; that the C-shaped road around the building was cut off by the blockades, to include a flipped trailer.  Initial App. Tr. 40. These exhibits showed a map of the road and where the blocks occurred. The exhibits also showed the debris put out by the defendants on March 1, 2026, to include tank traps or Czech hedgehogs, which are large metal objects that create a physical obstacle for vehicles. Initial App. Tr. 40. Other exhibits showed the defendants communicating about these actions before,

2

during and after the events.  *See* Initial App. Tr. 40-41.

The Court then ruled that the conditions of release would be no contact between co-defendants except through lawyers and to prepare a defense (with one carveout exception for two defendants that live together). The Court stated:

> I do, though, having had an opportunity to review the entire record, find that the additional conditions requested by the prosecution are sound. Number one, if there's going to be protests and you're charged in this case, those protests cannot be on federal property. Number two, there cannot be contact with other defendants except through the attorneys for purposes of preparing a defense in this case.
>
> Initial App., Tr. 44-45.

**<u>The Defendants agreed to this condition of release on June 16, 2026</u>**

After court on June 16, 2026, the Magistrate Judge issued the order setting the conditions of release and each defendant individually signed the acknowledgement agreeing to obey the conditions and were released. *See* ECF Nos. 57, 37, 40, 50, 60, 72, 99, 101.

On July 1, 2026, the Defendants filed their first motion to modify conditions of release and thereafter filed eight to twelve motions to modify conditions of release

(including appeals to the district court). *See* ECF Nos. 151, 152, 160, 171, 172, 173, 175, 177, 195, 196, 199, 200. None of the individual defendants allege a change of their personal circumstances that make these conditions any more burdensome than when they signed and agreed to these conditions of release on June 16, 2026.

**A second Magistrate Judge upheld the no-contact order**

On July 14, 2026, Magistrate Judge Shultz upheld the no-contact conditions of release and modified the conditions to read:

> . . . Avoid all contact, directly or indirectly, with any person who is or may be a victim or witness in the investigation or prosecution, including: codefendants listed in the Indictment while outside the presence of counsel. The Government shall provide a No Contact list to the defendant, defense counsel, and U.S. Probation Office.
>
> ECF No. 182.

**The Indictment**

The 94-page indictment lists two-hundred and sixty-nine overt acts, many of which go to the communication and planning of the events and actions that impeded federal law enforcement. *See generally* ECF No. 1. The indictment lays out the deep Signal communications and planning for January 23, 2026, and March 1, 2026, blockades at the federal building between all co-defendants. *See generally* ECF No. 1.  This plan

includes in-person group meetings where people were parceled into groups for specific duties on the day of, calls for shield making and training on how to use the shields and this includes meetings (in person and by Zoom) for debriefing on the blockade events. *See generally* ECF No. 1. The Indictment also lays out the plan and conspiracy that reached the interstate stalking charges, where defendants used the Signal chat groups to follow federal agents across state lines. *See generally* ECF No. 1.

## Defendant Doyle

On January 23, 2026, Defendants Sant and Doyle worked together to drive a cargo trailer to the Whipple Building, pass out large shields, white 55-gallon drums and wooden shields from the back of the cargo carrier to a crowd of approximately 30-40 people.  *See* ECF No. 1, ¶ 36, ¶ 41, ¶ 46, ¶ 68-69. Doyle sent messages on a Signal channel titled "Whip 03/01", noting his participating in shield making, storage of the shields, in-person planning meetings as well as handing out shields at the event. *See* ECF No. 1, ¶ 124, ¶ 140, ¶ 158, ¶ 167-170, ¶ 171-172, ¶ 194-195.

## Defendant Morgan

Defendant Morgan participated in Signal chat groups Whipple Watch and Whipple Watch 3.0 that were "commuting chats" and suggested Morgan participated in commuting activities. *See* ECF No. 1, ¶ 249, ¶ 250. On May 12, 2026, Morgan followed a federal immigration officer from the Whipple Building to the area around the officer's residence in Hudson, Wisconsin, and Morgan was pulled over by Hudson police officers. ECF No. 1, ¶ 255. May 15, 2026, Morgan approached Homeland

Security Agents while performing their duties, knocked an agent's notes out of his hand and kicked a government vehicle twice, causing dents.  ECF No. 1, ¶ 258. In an April 18, 2026, in-person meeting, Morgan described Morgan's participation in the January 23rd and March 1st events. ECF No. 1, ¶ 124, ¶ 239.

**Defendant Misterek**

On January 27, 2026, in an in-person meeting, Defendant Misterek admitted to taking part in the soft blockade at the Whipple Building on January 23, 2026. ECF No. 1, ¶ 82. Misterek participated in the "Whip 03/01" Signal chat group with regards to the March 1, 2026, blockade. *See* ECF No. 1, ¶ 109, ¶ 117, ¶ 132. Misterek participated in the March 1, 2026, blockade, carrying items to include "Czech hedgehogs," which are static obstacles made of metal angle beams that were unloaded onto the street from Misterek's blue truck, with Stewart and Kim as passengers. ECF No. 1, ¶ 198-199.

**Defendant Rakotz**,

From approximately March 11, 2026, to approximately May 21, 2026, Defendant Rakotz sent numerous messages in the "Whipple Plates," "Whipple Watch (Refresh)," and other Signal group chats, which included detailed descriptions of government-issued vehicles and their license plates as well as physical descriptions of suspected immigration and law enforcement officers. *See* ECF No. 1, ¶ 212, ¶ 213, ¶ 216, ¶ 218, ¶ 220, ¶226, ¶ 240, ¶ 241. On or about May 18, 2026, Rakotz followed a federal

immigration officer from the Whipple Building to the area of Minnesota State Highway 55 where Rakotz "brake checked" the officer and "side swiped" the officer's vehicle, causing a collision.  ECF No. 1, ¶ 260. After the incident Rakotz sent another message on Whipple Watch 3.0 noting Rakotz's handle was deleted from the chats for safety reasons due to arrest. ECF No. 1, ¶ 262.

**Defendant Stewart**,

On January 23, 2026, at approximately 8:54 a.m., Kim and Stewart were seen at the Fort Snelling Light Rail station.  ECF No. 1, ¶ 40. Stewart participated in an in-person meeting on February 16, 2026, that included planning the March 1, 2026, event. ECF No. 1, ¶ 113-114. Stewart also participated in "Whip 03/01" Signal chat group along with other Signal chat groups with regards to planning the March 1, 2026, blockade. *See* ECF No. 1, ¶ 117, ¶ 123, ¶ 133, ¶ 139, ¶ 140, ¶ 144, ¶ 148, ¶ 151, ¶ 161, ¶ 176. On March 1, 2026, Stewart participated in the hard and soft blockade at the federal Whipple building, to including putting "Czech hedgehogs" in the street along with other debris. ECF No. 1, ¶ 188, ¶ 198, ¶ 199.

**Defendant Davis**

Davis participated and moderated in-person planning and debriefing meetings and Signal chat groups for the specific blockade event on January 23, 2026. *See* ECF No. 1, ¶ 1, ¶ 2, ¶ 11, ¶ 34, ¶ 80, ¶ 82, ¶ 83.

**Defendant Kim**

Kim participated in the January 23, 2026, blockade event. ECF No. 1, ¶ 40. Kim was seen receiving a radio at the light rail video. ECF No. 1, ¶ 40. Kim participated in the debriefing on the blockade afterwards. ECF No. 1, ¶ 80, ¶ 99. Kim participated in Signal chat groups that involve the planning of the March 1, 2026, blockade. *See* ECF No. 1, ¶ 132, ¶ 134, ¶ 144, ¶ 166. On March 1, 2026, Kim was a passenger in Misterek's truck and unloaded debris and Czech Hedgehogs onto the road for the blockade around the Whipple building. ECF No. 1, ¶ 198, ¶ 199.

**Defendant Thoreson**

On January 23, 2026, Defendant Thoreson participated in the blockade and transported and handed out shields. *See* ECF No. 1, ¶ 30, ¶ 33, ¶ 35, ¶ 53, ¶ 64. Thoreson also participated in debriefing meetings of that blockade and meetings to plan the March 1, 2026, blockade as well as participated in Signal chat groups for the same purpose. *See* ECF No. 1, ¶ 80, ¶ 111, ¶ 116, ¶ 133, ¶ 138, ¶ 139, ¶ 140, ¶ 147. Thoreson also participated in and marshaled the March 1, 2026, blockade. *See* ECF No. 1, ¶ 177, ¶ 178, ¶ 179, ¶ 181, ¶ 182, ¶ 183, ¶ 185, ¶ 186, ¶ 191, ¶ 192. Thoreson also participated in after event debriefs and Signal chats with regards to the March 1, 2026, blockade. *See* ECF No. 1, ¶ 206, ¶ 207, ¶ 208.

**Defendant Kennedy**

Defendant Kennedy purchased a trailer for the January 23, 2026, blockade. *See* ECF No. 1, ¶ 22, ¶ 27, ¶ 55. Kennedy stated the action came with the risk of arrest. ECF No. 1, ¶ 27. Kennedy also rented a 10-foot U-Haul on January 23, 2026. ECF No. 1,

¶ 29. In an in-person meeting on January 27, 2026, Kennedy discussed his involvement and in the hard blockade around the Whipple Building on January 23, 2026. ECF No. 1, ¶ 82. Kennedy also took part in shield and "de-arrest" training and discussed the use of shields in Signal chats. *See* ECF No. 1, ¶ 110, ¶ 142, ¶ 172, ¶174.

At an April 18, 2026, speaking event, Kennedy discussed the January 23, 2026, blockade action at the Whipple Building using shields at one entrance as the soft blockade.  Kennedy stated:

> two other deployment teams…those deployment teams had trailers that they had bought off of Facebook Marketplace for really cheap and they essentially tried to blockade the other entrances simultaneously with this blockade (pointed to soft blockade on the projector).  One of those trailers was deployed and flipped and successfully shut access.  The other was about 30 seconds away from successful deployment before the team was actually pepper sprayed.  They managed to avoid arrest…and they managed to drive away, albeit losing the trailer in the process."
> ECF No. 1, ¶ 234.

During the speaking event, Kennedy described actions at the Whipple Building as including "intentional shut them down blockades." ECF No. 1, ¶ 236. In the same

9

address, Kennedy pointed to the projector screen and said, "the one you see over here is another shield wall on March 1st." ECF No. 1, ¶ 236.  He continued:

> "this demonstration had four components to it.  There was a above ground march that was led by indigenous sundancers that would take up gate one of the Whipple Building and the others were designed to essentially shut down the other two points of egress…there was 3 deployment teams.  The first deployment team brought in shields."
>
> ECF No. 1, ¶ 236.

The second deployment team, Kennedy continued, "was sent in and they had something to be like tank busters…" Kennedy described these items as similar to "images of like D-Day, they're like the metal X structures that you see and actually when the vehicles hit them, it digs back into the road and will stop the vehicle." ECF No. 1, ¶ 236.

Kennedy explained, "I was on deploy 2 or deploy 3 and I had a 10-foot U-Haul box truck and a 30-foot trailer that I was going to use to block one of the entrances." ECF No. 1, ¶ 236.

Kennedy discussed the raising of funds for January 23, 2026, blockade at a meeting and in meetings and Signal chats for the March 1, 2026, blockade. *See* ECF No. 1, ¶

85, ¶ 113, ¶ 120, ¶ 127, ¶ 128, ¶ 131. In discussing raising money, Kennedy told Defendant Van Der Water Davis that Kennedy "really appreciate the risk you are taking and of possible support as much obfuscation of your identity as you want/is possible.  Hopefully we can reach our goal and pull it before anything really connect with you or us." ECF No. 1, ¶ 131.

**Defendant Beisell**

Defendant Beisell attended January 23, 2026, and March 1, 2026, blockade action. *See* ECF No. 1, ¶ 80, ¶ 176. On or about February 17, 2026, Beisell organized the meeting to discuss "de-arrest" and swarm training. *See* ECF No. 1, ¶ 81, ¶ 122. Beisell distributed shields at the March 1, 2026, soft blockade. ECF No. 1, ¶ 188, ¶ 189.

**Defendant Apland**

Defendant Apland communicated with and arranged meeting Defendant Wager about using a truck to pull the trailer for the January 23, 2026, blockade, and then introduced Wagner to Defendant Kennedy. *See* ECF No. 1, ¶ 10, ¶ 13, ¶ 14, ¶ 15, ¶ 17, ¶ 21, ¶ 26, ¶ 27. January 22, 2026, Apland and Wagner exchanged 20 connected Signal calls.  ECF No. 1, ¶ 28. Apland attended a debriefing meeting after the January 23, 2026, blockade event. Apland also participated in de-arrest meetings and Signal chat groups about shields construction ECF No. 1, ¶ 110, ¶ 171.

**De-arrest and shield trainings were used to impede law enforcement on**

11

**March 1, 2026**

On or about February 17, 2026, Sant, Apland, Kennedy, Van De Water Davis, Thoreson, Beisell, and others attended a meeting to discuss "de-arrest" and swarm training. ECF No. 1, ¶ 110. On February 22, 2026, Kennedy and others took part in "de-arrest" training at Loring Park in Minneapolis. ECF No. 1, ¶ 142. Also on February 17, 2026, Sant sent a message in the "Whip 3/1" Signal chat group, stating "Melt the Ice organizers are asking us to do the same thing we did the 23rd, block Minnehaha…While their march takes the street on the other side by 62E." Stewart responded "So soft blockade with shields?" Misterek replied "I say if we can figure it out we go further than just that." ECF No. 1, ¶117.

January 23. 2026, shields were used as a soft blockade at Whipple building. *See* ECF No. 1, ¶ 33, ¶ 37, ¶ 41, ¶ 44, ¶ 47, ¶ 114.

On March 1, 2026, individuals with shields blocked access to and from Minnehaha Avenue North in the vicinity of the Whipple building. *See* ECF No. 1, ¶ 188, ¶ 190, ¶ 193, ¶ 194, ¶197. The Hennepin County Sheriffs deputies performed disbursement notifications to individuals at the blockade at Minnehaha Avenue North. ECF No. 1, ¶ 201. During this time shields were used to physically place an obstacle between arrestees and deputies. *See* G.J. Ex. 3, slides 9-12.

**Collecting cell phones at meetings and discussing deleting members from chats upon arrest**

On January 27, 2026, Sant, Kennedy, Van De Water Davis, Thoreson, Kim, Robinet, Misterek, Davis, Beisell, and others attended an "after action" meeting pertaining to the January 23, 2026, blockade at the Whipple building.  Sant and Davis led the meeting and Sant collected participants cell phones, smart watches, and other electronic devices and placed them in a plastic bin.  ECF No. 1, ¶ 80. On or about February 13, 2026, Sant, Apland, Kennedy, Doyle, Van De Water Davis, Kim, Robinet, Davis, Beisell attended a Davis-moderated the meeting and Kim collected cell phones and walked them to a room in the back. ECF No. 1, ¶ 99 Kennedy discussed the need for trucks that could be used in a future blockade. ECF No. 1, ¶ 99. On February 17, 2026, Sant, Apland, Kennedy, Van De Water Davis, Thoreson, Beisell**,** and others attended a meeting that during the meeting, Sant and another male walked around the room and collected all attendees' cell phones and placed them in a tote bag.  The group discussed "de-arrest" and swarm training. ECF No. 1, ¶ 110.

On February 16, 2026, at 11:32 a.m., Van De Water Davis, sent a message in the "TC DA" Signal chat group, stating:

 This chat (TC DA Signal Group) is being closed in the next 24 hours…We have concluded the initial vetting process and will be creating a new group chat with all vetted members.  If you did not respond to a member of the vetting team by

13

this time, you will not be added to the new group. You can still be added, you just need to complete the process…If you have questions, please DM the vetting team member you have been working with. ***Once the new chat is up, this chat will be renamed Leave and Delete.*** (emphasis added) Please leave the group promptly an delete it from your message history. Don't forget to request to be added to the new chat before leaving this one!

ECF No. 1, ¶ 107.

Van De Water Davis, sent the link to the new chat group, which was renamed "TC DA (2)." ECF No. 1, ¶ 107.

On May 18, 2026, at approximately 2:14 p.m., an unindicted coconspirator sent a message in the "DAMN" Signal group chat, stating, "Remove anuran (Rakotz**)**" Another unindicted coconspirator tagged Van De Water Davis, and other unindicted coconspirators. An unindicted coconspirator, who was the chat administrator, messaged "On it" and removed Rakotz from the "DAMN" Signal group chat at approximately 2:17 p.m. ECF No. 1, ¶ 261.

On May 18, 2026, at approximately 4:43 p.m., Rakotz sent a message in the "Whipple Watch 3.0" Signal group chat, stating, "I was never in custody to be clear but good job y'all I'm being so quick to boot me just in case…Oh hell yeah group safety is way more

14

important than my admission to a group!  Like I said I was hella impressed." ECF No. 1, ¶ 262.

**LAW**

While the Eight Amendment prohibits excessive bail, courts have the power to place restrictive conditions on that bail. *See United States v. Smith,* 444 F.2d 61, 62 (8th Cir. 1971).  In *Smith*, the Eighth Circuit Court stated that "The primary purpose of bail is to allow an accused person not yet tried to be free of restraint while at the same time insuring that person's presence at the pending court proceedings." *Id*. The United States Supreme Court has held that pretrial detention is regulatory in nature and does not constitute punishment in violation of the Due Process Clause. *See United States v. Salerno*, 481 U.S. 739, 748 (1987).  In *Salerno*, the Court held that detention is a carefully limited exception on liberty and that the provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception. *See United States v. Salerno*, 481 U.S. 739, 755 (1987).

18 U.S.C. Section 3142(c)(1)(B)(v) covers the conditions of release with regards to no contact orders. No contact orders are a typical condition of release when there are many co-defendants in the indictment. *See United States v. Brown et al*, 23-cr-160 (in particular in *United States v. Washington*, 7(g), Doc. No. 546, ordering no contact with codefendants). *See also United States v. Williams, et al*, 26-cr-56 (in particular in *United States v. Brown*, 7(g), Doc. No. 120).

15

Further, in the District of Minnesota, the specific conditions of release have been addressed with regards to no-contact orders (as well as other conditions of release). In *United States v. Armstrong*, the Court wrote:

> . . . All of the conditions that Levy Armstrong challenges are standard, relatively non-invasive release conditions imposed on defendants charged with a felony. Indeed, in 2024, the release condition ordered most often in the federal courts "was pretrial services supervision, which was imposed on 87 percent of defendants released." *United States Courts*, Pretrial Services— Judicial Business 2024, available at https://perma.cc/K26B-YMTM.

> *United States v. Armstrong,* 2026 WL 509035, 2 (D. MN. 2026) (Case No. 26-cr-25 (1) (LMP/DLM))

The *Armstrong* Court also cited *Smith* in noting that a no-contact list advances the Court's responsibility to safeguard the proceedings and witnesses. *Id*. As to Armstrong's condition of release that prohibits travel without permission, the Court reasoned that while pre-trial conditions do place a burden on defendants that citizens who are not charged with a crime do not suffer, these requirements relate to the government's interest in assuring an appearance. *Id*.  Further, Armstrong, the Court continues, was not entirely prohibited from traveling but instead had to

16

seek permission to travel. *Id*.

In the present case, the Defendants are not prohibited from contact with one another without exception. All defendants in *Sant et al.* are allowed to have contact through their attorneys and for the purpose of preparing a defense in this case. Initial App. Tr. 44-45. This was the least restrictive condition the Court could place on release in order to both safeguard the defendant's right to prepare a defense and safeguard the proceedings against the potential of collaborated testimony. Further, all the defendants signed and agreed to these conditions at the outset of being released.

Further the restriction on contact between co-defendants is narrowly tailored so as not to impinge on any defendant's right to prepare a defense. In *United States v. Martinez*, the court took up the issue of a no-contact, pre-trial order between co-defendants who were married. *United States v. Martinez*, 2021 WL 4169789, 2 (S.D. I.A. 2021). Here the court cautions against broad conditions of release:

> That result in "sweeping restrictions on important constitutional rights." *Id*. at 368 (quoting *United States v. Crume*, 422 F.3d 728, 733 (8th Cir. 2005)). Restrictions are appropriate only when they are necessary to achieve a valid statutory purpose. *Id*. at 369. Where a more narrowly-tailored condition is available, it must be used. *Id*.

17

*United States v. Martinez*, 2021 WL 4169789, 2 (S.D.I.A. 2021).

In *Hobbs,* the Eight Circuit recognized the importance of the Constitutional right to marriage in determining appropriate conditions of release, however that case dealt with conditions of supervised release post-sentencing. *United States v. Hobbs,* 845 F.3d 365, 367-368 (8th Cir. 2016). The present case and *Martinez* are distinguishable as both cases are pre-trial release. *See United States v. Martinez*, 2021 WL 4169789, 2 (S.D.I.A. 2021).

**Non-binding jurisdictions**

In *United States v. Olivarez*, the Court found the no-contact bond condition was fully warranted between defendant and her significant other. *Id.* at 2; *Cf. United States v. Pickel*, 500 F. App'x 771, 772-73 (10th Cir. 2012) (finding no abuse of discretion for a pre-trial no-contact order between common-law spouse-defendants in part due to the potential for collusion between witnesses). *United States v. Olivarez*, 2022 WL 16836338, 2 (S.D. TX. 2022).

In *Lillemore*, the United States District Court of Connecticut, balanced the conditions of pre-trial release with the right to free association and the ability to prepare a defense. *United States v. Lillemore*, 2015 WL 9694385, 2 (D. Conn. 2015). The court ultimately amended the conditions of release; however, it noted that the fact that the grand jury found probable cause that the defendants made false

documents is relevant to the question of whether they can be trusted to not collude testimony, though not dispositive.[1] *Id.* at 2.

In *Paquin*, the court noted that federal and state courts of appeal have upheld pre-trial no-contact orders as an inherent court power in criminal cases. *United States v. Paquin*, 676 F. Supp. 3d 970, 974 (D.N.M. 2021). The court has the inherent authority to protect victims and witnesses. *Id.* at 976. In *Paquin*, the court was determining and granting a motion to amend a no-contact order for detention conditions and not pre-trial conditions of release. *Id.* at 974.

In this case, all defendants communicated by Signal and in-person to further the conspiracy to create blockades for federal law enforcement. They went so far as to debrief on their tactics from one event while still planning the next and to continue to train one another on how to use shields and de-arrest tactics. Defendants also collaborated to raise money together through Signal chats to continue their efforts in impeding federal law enforcement. Signal use and in-person meetings are central to this conspiracy.

The defendants also had protocols for deleting chat members who were arrested so that the Signal chats could not be compromised with the rest of the group. Phones were collected at the inception of in-person meetings and trainings to avoid being

---

[1] While the court modified a no-contact order between defendants in a pre-trial release order, there is not enough facts in the opinion itself to distinguish from the present case, such as the relationship between the co-defendants.

19

recorded. While these protocols and chats occurred prior to the immediate prosecution, the Defendants prodigiously hid the evidence of their individual participation, fundraising and training efforts in this case.

## CONCLUSION

The Defendants in this case systematically and in concert, planned, fundraised, debriefed and trained to impede federal law enforcement. The Defendants followed protocols to obfuscate their identity, plans and training, and to obstruct access to the group messages upon arrest. The no-contact order in this case is both narrowly tailored to allow Defendants to participate in their defense and advances the Court's responsibility to safeguard the proceedings.

Dated: 8/11/2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ Sommer Honeycutt*

BY:   SOMMER HONEYCUTT
Special Assistant U.S. Attorney
600 U.S. Courthouse
300 S. 4th Street
Minneapolis, MN 55415
MN Attorney Reg: 0398667
Sommer.Honeycutt@usdoj.gov
(612) 664-5600

20