UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Court File No. 26-cr-115 (KMM/DTS) |
| Plaintiff, | |
| v. | **DEFENDANT'S MOTION FOR DISCOVERY UNDER RULE 16 AND *BRADY/GIGLIO*** |
| Isaac Sant, | |
| Defendant. | |

## INTRODUCTION

This case involves an unprecedented campaign by DHS to spy on Minnesotans. During Operation Metro Surge, undercover agents posing as protesters surveilled community meetings at churches, parks, libraries, schools and union halls. These agents surreptitiously recorded dozens of conversations with ordinary people who were simply exercising their First Amendment right to protest ICE's lawless rampage in our state. The agents gathered information about Minnesotans from law enforcement databases and internet searches, and created dossiers that are apparently now available agency-wide.

HSI's abuses did not stop there. HSI secretly obtained financial records for several national labor unions, including SEIU and the Communications Workers of America, and social justice non-profits including the Sunrise Movement and Voices for Racial Justice, all with zero criminal predicate to do so.

The government's presentation to the grand jury reflected this broad and irrational investigation. With no evidence, the government alleged to the grand jury that the

conspiracy in this case extends far beyond the defendants to include the AFL-CIO, the Minneapolis Federation of Educators, the Minnesota Association of Professional Employees, Monarca, Veterans for Peace, and the Grease Pit bicycle repair shop, among others.

These wild conspiracy allegations are born from the fantasies of political retribution that animate the Trump Administration. President Trump and senior administration officials routinely speak of the political left in de-humanizing terms – as "deformed," "scarred," and "filled with ugliness," for example. The administration has crystallized these sentiments into policies that encourage and authorize political prosecutions like this one. Most notably, in September 2025, President Trump issued National Security Presidential Memorandum 7 ("NSPM-7"), which directs DOJ to prosecute ICE protesters and opponents of the administration. HSI cited NSPM-7 as its authority to open this case.

The government's initial disclosures chronicle HSI's abuses and confirm the political animus driving this case. But they are incomplete. They are missing, among other things, specific reports of investigation ("ROIs") that the government has admitted withholding, claiming the ROIs are "unrelated" to this investigation even though they were created and filed within it. The disclosures omit any ROIs that document HSI's domestic surveillance but were placed in other case files. They omit documents and communications related to the initiation and supervision of HSI's undercover operations. And they omit downloads of the "undercover phones" and "undercover laptops" used by the undercover agents in this case to communicate with the defendants and others.

2

Mr. Sant respectfully requests that the Court order the government to make these disclosures. They are material to preparing his defense and should be produced under Rule 16, are critical to the selective prosecution and outrageous government conduct motions he intends to bring, and must be disclosed under *Brady* and *Giglio*.

## BACKGROUND

I.     **FOUR DAYS AFTER AGENTS MURDERED ALEX PRETTI, HSI BEGAN ITS CAMPAIGN OF DOMESTIC SPYING.**

On January 28, 2026, just four days after agents murdered Alex Pretti, HSI officially opened its mass spying campaign, which it called "Operation Puppet Master." Per HSI:

> Since November 28, 2026, ongoing protests and incidents of civil unrest have occurred in public areas throughout Minneapolis, MN. During these events, violent opportunists (VOs) have exploited the protests as cover to attempt breaches of federal properties and have perpetrated multiple assaults against federal officers tasked with protecting these facilities. . . . HSI St. Paul has identified an organized network of conspirators operating through online and in person who are providing material support to violent opportunists and agitators involved in impeding federal law enforcement, rioting, destruction of Federal property and assaults on Federal agents and Officers.

Ex. 1.

HSI does not identify any specific "violent opportunists" in this report, nor does it flag any specific incidents of "rioting, destruction of property, [or] assaults on federal agents and officers."[1] As detailed below, the undercover surveillance initiated by Operation Puppet Master did not actually investigate or unearth any such instances, but instead

---

[1] Notably, when asked at the press conference announcing the Indictment to identify specific incidents where law enforcement officers were injured by the alleged conspiracy, U.S. Attorney Daniel Rosen declined. The Indictment lists none. *See* https://www. mprnews.org/story/2026/06/16/federal-prosecutors-minnesota-announce-charges-against-immigration-enforcement-opponents.

encompassed all manner of privacy and constitutional violations against organizations and

individuals who opposed ICE's activities in Minnesota.

The case opening report concludes:

> HSI St. Paul is actively conducting a thorough financial investigation to uncover the funding sources used by these groups and to detect any illicit transactions enabling further criminal acts. HSI St. Paul will use the results of this financial investigation to identify those responsible, disrupt ongoing and future unlawful activities, and pursue prosecution of the individuals involved.

> This case is opened to document the integration of Homeland Security Investigations (HSI) Undercover Agents (UCAs) into groups, organizations, or other gatherings identified by intelligence information and other sources as potentially threatening to law enforcement personnel in the performance of their duties.

*Id.* at 2.

Two weeks after starting Operation Puppet Master, HSI opened "Project Whipple

Shield." Ex. 2. That case opening report states: "[HSI] has opened an investigation into

instances where individuals and organized networks have exploited events to engage in

acts of violence, destruction of property, intimidation of federal officers and employees,

and attempts to impede federal operations." *Id.*

The report emphasizes: "This investigation is focused on identifying and disrupting

sophisticated, organized campaigns supporting and engaging in this behavior and to

prevent such unlawful activities, while continuing to safeguard the rights of peaceful

demonstrators and the public." *Id.* Finally, it states: "This investigation will prioritize the

identification of funding sources, organizational structures, and predicate actions behind

these campaigns." *Id.*

4

As with Operation Puppet Master, HSI's investigation in Project Whipple Shield extended far beyond any potential threat to law enforcement safety. It concluded, with no evidence (but obvious political animus), that numerous Twin Cities unions and non-profit organizations were involved in a widespread conspiracy to violate 18 U.S.C. § 111 (assaulting, resisting, or impeding certain officers or employees), and it surveilled and surreptitiously gathered financial records generated by these organizations despite the lack of any connection between those organizations and criminal conduct.

## II.    THE GOVERNMENT HAS CONJURED UP A VAST AND IRRATIONAL CONSPIRACY IN THIS CASE.

HSI has dreamed up a conspiracy that includes, among others, Monarca, the Minneapolis Federation of Educators, the Minnesota Association of Public Employees, and the AFL-CIO, as well as Direct Action Minnesota ("DAMN"), an organization with which some of the defendants in this case are alleged to have been involved. Below is a diagram prepared by HSI and presented to the grand jury visualizing this conspiracy:



Ex. 3.

HSI Agent Desmond Garcia testified to the grand jury regarding this slide:

Q. And can you tell us what you see on page 5 of Grand Jury Exhibit 1A?

A. This is kind of a breakdown. Like I mentioned earlier with members of DAMN being associated with other organizations through the course of the investigation this is just a snapshot of some of the other organizations that members are affiliated with that kind of comprise and make up DAMN.

Ex. 4 at 27:4-11. Thus, the government apparently believes – and certainly told the grand jury – that if any individual was connected to both DAMN and any of these entities, the government considers the entities to be conspiring.

### III.  HSI SECRETLY OBTAINED THE FINANCIAL RECORDS OF UNIONS AND NON-PROFIT ORGANIZATIONS.

Fueled by visions of this vast and irrational conspiracy, HSI surreptitiously obtained financial records of labor unions and non-profit organizations as part of a "financial investigation" into "domestic terrorist financing." For example, one ROI describes the use of an administrative summons to obtain years' worth of "wire transfers from various financial institutions to and from Service Employees International Union (SEIU) main financial institution U.S. Bank of Minneapolis, Minnesota . . . ." Ex. 5; *see also* Ex. 6 (SEIU administrative summons); Ex. 7 (documenting searches for various SEIU transactions by the Federal Reserve Bank of New York).[2] Not surprisingly, this sneak peek into SEIU's finances revealed nothing more than "various types of debits and credits to include annuity payments, strike payments, strike supplies, investments, union member dues, retiree dues, medical expenses, and pension fund expenses." Ex. 5 at 3.

HSI also issued an administrative summons seeking financial information regarding the Communications Workers of America's ("CWA's") donations and PAC spending from 2023-2026. Ex. 8; *see also* Ex. 9 (documenting CWA transaction searches by the Federal Reserve Bank of New York). CWA is an international labor union representing over 700,000 workers in a broad range of industries, including employees of most of the print

---

[2] Among other problems, this use of administrative summons seems to violate the Right to Financial Privacy Act, which requires law enforcement to provide notice to the account holder if they are trying to obtain bank records via administrative subpoena. *See* 12 U.S.C. § 3405. Here, not only did HSI hide these inquiries from the account holders, it told responding financial institutions: "*You are requested not to disclose the existence of this summons for an indefinite period of time. Any such disclosure will impede the investigation and thereby interfere with the enforcement of federal law.*" Ex. 8 at 2.

and broadcast news media companies in the United States. Digging through CWA's financial records raises significant First Amendment concerns, to say the least. This investigation into CWA's finances even included obtaining information about a *Canadian* union – the International Federation of Professional and Technical Engineers. Ex. 8 at 3.

HSI subpoenaed PayPal and Venmo for information regarding payments to and from Voices for Racial Justice ("VRJ"). Ex. 10. VRJ has been operating in Minneapolis since 1993 and describes itself as "the longest running racial justice organizing training organization in the State of Minnesota."[3] HSI provides no explanation of why it sought VRJ's financial records, beyond stating: "[VRJ's] website boasts several articles on 'ICE OUT' and or 'Truth, Freedom and ICE out of MN'. Their website also provides links to Defend the 612, mspwhistles, and Monarca Rapid Response for upcoming neighborhood trainings." *Id.*

Similarly, HSI surveilled, investigated, and obtained financial records related to the Sunrise Movement, a nonprofit focused on climate change and other social justice issues.[4] *See, e.g.,* Ex. 8 (administrative summons for financial records);  Ex. 9 (Federal Reserve Bank of New York transaction searches); Ex. 11 (documenting surveillance of Sunrise Movement meeting at Minneapolis Public Library); Ex. 12 (documenting surveillance of Sunrise Movement meeting and UCA involvement with planning noise demonstrations).

This broad collection of financial records of labor and social justice advocacy organizations, done in secret and with no articulable criminal predicate, violates both the

---

[3] https://voicesforracialjustice.org/
[4] https://www.sunrisemovement.org/

8

First Amendment and these organizations' right to financial privacy. It also reflects a sinister turn in our democracy, when the party in power feels no compunction about peering into the private finances of its political opponents, collecting that information, and storing it away for further use.

## IV.    THE GOVERNMENT ENGAGED IN WIDESPREAD UNDERCOVER SURVEILLANCE OF THE COMMUNITY.

Undercover HSI agents ("UCAs") posing as protesters or activists surveilled community meetings at churches, parks, libraries, union halls, schools and restaurants. *See, e.g.,* Ex. 13 (documenting UCA surveillance at meeting in Hunter College in New York); Ex. 14 (documenting UCA agents' surveillance of meeting at the United Labor Center building in Minneapolis); Ex. 15 (documenting surveillance at Loring Park); Ex. 16 (documenting UCA surveillance of a meeting at the Augsburg Park Library); Ex. 17 (documenting surveillance at St. John's Church); Ex. 18 (documenting surveillance at Zion Lutheran Church); Ex. 19 (documenting UCA participation in a boxing class at the University Baptist Church). UCAs secretly made audio and video recordings of these meetings.

UCAs actively participated in organizing and directing the groups they were surveilling, at times working to entice people into discussing or committing crimes. For example, one ROI documents UCA agents' participation in a Sunrise Movement meeting at the Minneapolis Public Library. Ex. 11. Per UCA 9833:

> During the Action meeting, it was made clear that the Sunrise Movement organization focused on "peaceful" protests. UCA 9833 spoke to [redacted] privately and informed him that he works construction and could build items that might assist other groups with more "direct-action" protests. UCA 9833

told [redacted] that going to jail did not bother him. [Redacted] acknowledged UCA 9833's comments and then saved UCA 9833's phone number.

(00047459); *see also* Ex. 12 ("HSI UCA 9843 volunteered to assist in the 'action' team of HSI UCA 9843. This group appeared to be involved in the planning of mass-non-cooperation where the potential of violations of law could occur, as well as threats to ICE employees and public safety.").[5]

UCA 9843 – who operated under the Signal screenname "peanutbutterjelly" – routinely exchanged Signal messages with people regarding purely First Amendment protected conduct. *See, e.g.,* Ex. 20 at Line 5274 (messaging participants in the "art/money/comms club" Signal chat, and stating: "also v interested in the financial organizing piece (I like numbers and data) & marrying that together with propaganda so would love to work on both sides of these groups!!"); Lines 6146, 6167, 6329, 6348 (discussing fundraising messaging strategies and hanging posters to solicit funds); Line 11986 (offering to draft fundraising language for TCDA); Line 39424 (offering to design protest flyer); Line 72637 ("im sure you're swamped w the speaking tour but do you have a suggestion for a donation platform? I believe open collective and the idea of asking our own banks what the looks like was discussed").[6]

---

[5] No other contact between [redacted] and UCA 9833 is recorded in any ROI provided with the initial disclosures.

[6] Ex. 20 is an Excel Spreadsheet bates-labeled 00047313. Counsel will provide it to chambers on a thumb-drive (all parties should already have a copy from the government's initial disclosures).

UCAs also routinely surveilled individuals engaged solely in First Amendment protected activity, including the Whipple Watch group that engaged in peaceful observation of ICE vehicle activity in and out of the Whipple Building – conduct that both Judge Menendez and Chief Judge Schiltz have confirmed is not unlawful. *See* Ex. 21; Order, *In re Grand Jury Subpoenas*, Case No. 26-mc-43 (PJS), Doc. 1 at 22 ("As a general matter, any citizen who happens across law-enforcement activity has a constitutional right to observe it, to record it, and to mention it to anyone they like . . . ."); Order, *Tincher et al. v. Mullin, et al.*, Case No. 25-cv-04669 (KMM/DTS), Doc. 85 at 65-68 (explaining that safely following ICE vehicles to observe them does not violate the law).

At Prince of Peace Lutheran Church in Roseville, agents captured license plate information of attendees during a meeting of anti-ICE protesters and activists. Agents then used this information to obtain the names of the attendees, searched social media for pictures of these individuals, and compiled an "intel workup" that included names, photos, addresses, personal information – including family and employment information – and vehicle registration information, for each meeting attendee. None of these individuals did anything other than engage in protected First Amendment speech in a church meeting room. Yet now their personal information is memorialized in a DHS dossier. *See* Ex. 22.

In another example, on January 19, 2026, UCA 9843 attended an in-person meeting at the La Dona Cerveceria restaurant in North Minneapolis at which planning was done for the general strike and protest march that occurred in Minneapolis on January 23, 2026, and was attended by tens-of thousands of protesters. Ex. 23 at 3. The ROI describes it as "a

general discussion on the upcoming walk out on ICE event being held on January 23." *Id.* This planning meeting was classic First Amendment protected speech and conduct.

UCAs even surveilled peaceful protests that had no connection to Operation Metro Surge. *See, e.g.,* Ex. 24 (documenting surveillance at No Kings protest); Ex. 25 (documenting UCA agents' surveillance of a "Stop the War on Iran!" protest organized by 50501, Veterans for Peace, and the Sunrise Movement).

Incredibly, Agent Garcia testified to the Grand Jury:

> One of the things that is abundantly clear not only in guidance but is just principles as far as this investigation is, no one is ever investigated or looked at or even researched on for First Amendment protected activities. Every single individual that we have investigated there is a criminal predicate to why we're investigating them, either statements that they have made that are criminal to their actual participation in overt criminal acts.

Ex. 4 at 214:23-215:8.

Of course, as the above examples demonstrate, HSI was obtaining wide swaths of financial data from labor unions and non-profits with zero "criminal predicate." UCAs captured dozens of First Amendment protected conversations on surreptitious recordings, many of which did not involve any of the defendants or unindicted co-conspirators in this case. Agent Garcia's statement is simply not true.

## V. THE TRUMP ADMINISTRATION HAS UNLEASHED A WAVE OF POLITICAL PROSECUTIONS.

On September 25, 2025, President Trump kicked off a new era of political prosecutions by issuing NSPM-7. Ex. 27. NSPM-7 is a blueprint for prosecution and harassment of those who protest ICE abuses or otherwise oppose this administration. It references protests of ICE activity in Portland and Los Angeles (labeling them "riots") and

describes these protests as "a culmination of sophisticated, organized campaigns of targeted intimidation, radicalization, threats, and violence designed to silence opposing speech, limit political activity, change or direct policy outcomes, and prevent the functioning of a democratic society." *Id*.

NSPM-7 directs DOJ and DHS to implement a "new law enforcement strategy that investigates all participants in these criminal and terroristic conspiracies — including the organized structures, networks, entities, organizations, funding sources, and predicate actions behind them . . . ." *Id.* at 2. It concludes: "Through this comprehensive strategy, law enforcement will disband and uproot networks, entities, and organizations that promote organized violence, violent intimidation, conspiracies against rights, and other efforts to disrupt the functioning of a democratic society." *Id.* at 2-3.

In short, NSPM-7 directs the investigation and prosecution of those who oppose ICE and who DOJ views as acting inappropriately to "change or direct policy outcomes" or "disrupt the functioning of a democratic society." NSPM-7 puts some gloss on this language by describing the "motivations" it considers suspect, including opposition to "traditional American views on family, religion and morality" and "foundational American principles (e.g., support for law enforcement and border control.)" *Id.* at 2.

Consistent with NSPM-7's posturing around "traditional American views" and "foundational American principles," DOJ and DHS have used it to authorize political prosecutions around the United States, including cases brought in the District of Minnesota, and surveillance campaigns like Project Whipple Shield.

13

In the wake of President Trump issuing NSPM-7, he and his administration have amped up their rhetoric against progressives and the political left. For example, senior Trump advisor Stephen Miller recently stated:

> The leftist is fundamentally motivated by envy, by hatred, by jealousy. The leftist looks at what is beautiful and what is good and what is natural and is filled with envy and hatred. The leftist looks at a perfect family with a perfect life and a perfect job and perfect kids that goes to church every Sunday and is filled with a feeling of inadequacy and jealousy, and they covet. And they turn those emotions ultimately into a desire to subjugate, to oppress, and to inflict pain and suffering.

> It's not a coincidence that when you look at these violent antifa demonstrations and you see any photograph of those who were assembled – to be blunt, not one of the people that is demonstrating looks like a normal person. Not one looks normal. They're all deformed in some way – in their appearance, in their dress, in their mannerism. . . . Every one of them, through the course of their life and their decisions, has scarred their body and their appearance in many different ways, to the point in which their outer appearance becomes a manifestation of their inner hatred.

Ex. 28 at 13.

Miller is the mastermind of President Trump's immigration policy, and during Operation Metro Surge he held daily inter-agency conference calls at which he provided direction regarding the administration's immigration and public safety policies.[7]  In short, his extreme hostility to the political left is not an outlier in the Trump Administration – it is at the center of power and policymaking, and so it is no surprise that DOJ and DHS pursued political prosecutions of administration opponents in Minnesota during Operation Metro Surge.

---

[7] https://www.cnn.com/2026/01/29/politics/stephen-miller-trump-immigration-minneapolis

Assistant Deputy Attorney General Aakash Singh directs the prosecutorial priorities of U.S. Attorneys' offices around the country, and he has operationalized NSPM-7 and Miller's instructions.[8] For example, in a meeting of U.S. Attorneys and their criminal division chiefs in January 2026, after the mass resignation of AUSAs in this District, Singh warned those gathered that President Donald Trump is their "chief client" and anyone uncomfortable with advancing his administration's directives must step aside. According to Bloomberg News: "Participants were taken aback by Singh's comments, which some interpreted as a clear reference to the Minneapolis prosecutors resigning that week after DOJ's orders to investigate protesters and state Democrats. Singh had closely coordinated those efforts, said two people with knowledge of his role."[9]

Singh has directed U.S. Attorneys' offices to initiate political prosecutions in other districts. He directed prosecutors to investigate and pursue charges against George Soros and his Open Society Foundation.[10] And he pushed the recently announced indictment of the Southern Poverty Law Center in Alabama. The House Judiciary Committee has begun an investigation into that case after receiving "whistleblower reports that [Singh] ordered the U.S. Attorney's Office for the Middle District of Alabama to rush through the indictment of the SPLC despite serious concerns about the strength of the case."[11] Singh

---

[8] https://chicago.suntimes.com/immigration/2026/06/08/aakash-singh-justice-department-blanche-boutros-trump-broadview-chicago

[9] https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump

[10] https://www.nytimes.com/2025/09/25/us/politics/justice-trump-george-soros-foundation.html

[11] *See* Ex. 4.

has also directed at least one U.S. Attorney's office to employ a corrupt grand jury process: "As multiple grand juries refused to indict Washingtonians on federal charges following mass street arrests, Singh instructed the office's criminal team to ask the chief judge to dismiss jurors who presented hurdles and then 'rinse and repeat' to a new panel."[12]

In May 2026, a federal court dismissed an indictment on the basis of vindictive prosecution because of interference from Singh and then-Deputy Attorney General Todd Blanche. *See United States v. Abrego Garcia*, No. 3:25- cr-115, 2026 WL 1454303, at *3 (M.D. Tenn. May 22, 2026) (finding unrebutted presumed vindictiveness and holding "[t]he reopening of the investigation, Blanche's unrebutted statements, and Singh's sustained oversight together support that inference. Blanche's statements tie Main Justice to the tainted investigation and confirm what motivated it.").

Given his history of initiating political prosecutions, it is unsurprising that Singh helped engineer the unlawful grand jury subpoenas used to harass Democratic political leaders in Minnesota.[13] On June 22, 2026, Chief Judge Schiltz quashed these subpoenas, writing:

> Initiating a criminal investigation in order to harass political opponents or to coerce them into taking official action-particularly official action that the federal government cannot directly require those political opponents to take-is a blatantly unlawful and unethical use the grand-jury process. The only question, then, is whether the challenged subpoenas were issued for one of these forbidden purposes. The Court has no doubt that they were.

---

[12] https://news.bloomberglaw.com/us-law-week/in-your-face-doj-aide-rides-prosecutors-for-chief-client-trump

[13] https://www.nytimes.com/2026/01/29/us/politics/minnesota-justice-department-trump-ice.html

Order, *In re Grand Jury Subpoenas*, Case No. 26-mc-00043 (PJS), Doc. No. 1 at 15; *see also id.* at 17-18 (describing "the Trump administration's well-established history of using criminal investigations to retaliate against and pressure the President's political and personal adversaries").

## VI.    IN JANUARY, DOJ BEGAN ITS ATTACK ON THE TRUMP ADMINISTRATION'S POLITICAL OPPONENTS IN MINNESOTA.

On January 13, 2026, a cadre of experienced and highly-respected federal prosecutors – including the entire management team– resigned *en masse* in protest of the politicization of federal criminal law enforcement in Minnesota.[14] Unfortunately, these resignations – which should have served as a wake-up call to DOJ – did little to slow the decline of a once great U.S. Attorney's office into a political prosecution factory.

In the immediate aftermath of Alex Pretti's murder, Singh directed federal prosecutors to aggressively charge protesters in Minnesota. According to the New York Times:

> In a conference call in late January, the official, Aakash Singh, laid out the department's basis for prosecuting demonstrators: National Security Presidential Memo 7, a sweeping directive issued by President Trump last September. It expanded the definition of domestic terrorism to include not only violent crimes like assault, but also relatively minor ones, like revealing the personal details of agents or getting in the way of immigration enforcement.
>
> Mr. Singh said that "coordinators" in U.S. attorneys' offices responsible for charging protesters under NSPM-7 should be "hounding" federal agents to make cases, according to people familiar with his remarks. He also suggested that the department wanted headlines along with indictments, promising that officials in Washington would be "blasting out" prosecutors' work.

---

[14] https://www.mprnews.org/story/2026/01/13/us-attorney-on-minnesota-fraud-joe-thompson-resigns-from-office

"Go big," Mr. Singh said, "and go loud."[15]

On January 28, 2026, DHS and the U.S. Attorney's office put Singh's direction into action. In one day, DHS both initiated "Operation Puppet Master" and also conducted the orchestrated self-surrender and doxxing of sixteen individuals charged with assaulting federal officers. The names and photos of these individuals were disseminated on Pam Bondi's and DHS' X (twitter) accounts, leading to widespread online harassment. The whole episode was clearly pre-designed to intimidate and deter other protestors from exercising their First Amendment rights – the same purpose as this prosecution.

Because these AFO cases had everything to do with public relations, and nothing to do with public safety, they quickly collapsed. Cursory review of the evidence showed that agents had lied and defendants were innocent. The government has voluntarily dismissed eight of the sixteen cases.[16] Others await dismissal. A week after the AFO cases were filed, eight more experienced AUSAs resigned in disgust, including the civil chief.[17] Again, the alarm bells should have gone off at DOJ. Instead, it doubled-down, opening Project Whipple Shield, expanding its surveillance of Minnesotans, and beginning the process of indicting this case.

---

[15] https://www.nytimes.com/2026/03/19/us/politics/justice-dept-prosecute-protesters.html
[16] *U.S. v. Sager*, Case No. 26-mj-69 (MJD/DJF); *U.S. v. Tschida*, Case No. 26-mj-54 (SGE); *U.S. v. Williams*, Case No. 26-mj-70 (SGE); *U.S. v. Adbebe*, Case No. 26-mj-77 (DJF); *U.S. v. Valentine*, Case No. 26-mj-28 (DLM); *U.S. v. Ahmed*, Case No. 26-mj-24 (DLM); *U.S. v. Johnson*, Case No. 26-mj-81 (SGE); *U.S. v. Rank*, Case No. 26-mj-56 (SGE).
[17] https://www.npr.org/2026/02/05/nx-s1-5702356/more-frustrated-prosecutors-at-the-u-s-attorneys-office-in-minnesota-call-it-quits

### VII.    AS DOJ PROSECUTED MINNESOTA PROTESTERS, IT WAS VACATING AND DISMISSING THE LAST REMAINING JANUARY 6 CONVICTIONS.

On the first day of his second term, President Trump commuted the sentences of 14 individuals – the "Oath Keepers" – convicted by a jury of conspiracy for their conduct before and during January 6. President Trump also granted "a full, complete, and unconditional pardon to all other individuals convicted of offenses related to the events that occurred at or near the United States Capitol on January 6, 2021."[18] Finally, President Trump directed the Attorney General "to pursue dismissal with prejudice to the government of all pending indictments against individuals for their conduct related to the events at or near the United States Capitol on January 6, 2021."[19]

On April 14, 2026, while the Oath Keepers' convictions were on appeal to the D.C. Circuit, the government filed an unopposed motion to vacate those convictions. *See* Unopposed Mot. to Vacate Convictions and to Remand for Dismissal with Prejudice, *Harrelson v. United States*, No. 23-3089 (D.C. Cir.) Doc. 2168665. The Court of Appeals granted that motion, and on May 22, 2026, the government moved to dismiss the indictment. District Judge Amit Mehta had no choice but to grant the motion.

In "reluctantly" dismissing these cases, Judge Mehta lamented:

> This is the last of the prosecutions seeking to hold accountable those responsible for the events of January 6. That book is now closed. Today's epilogue diminishes the gravity of that day, denigrates the work of the prosecutors and law enforcement officers who secured these convictions, and excuses criminal acts that caused a centuries-long pillar of our democracy—

---

[18] https://www.whitehouse.gov/presidential-actions/2025/01/granting-pardons-and-commutation-of-sentences-for-certain-offenses-relating-to-the-events-at-or-near-the-united-states-capitol-on-january-6-2021/

[19] *Id.*

the peaceful transfer of presidential power—to buckle. The court cannot write a different ending.

Memorandum Opinion and Order, *U.S. v. Elmer S. Rhodes, et al.*, Case No. 22-cr-00015 (APM), Doc. 981 at 15 (D.C. Dist., filed August 4, 2026). Three weeks later the government obtained the indictment in this case.

Deputy Attorney General Brian Lynch, who convened the grand jury in this matter and presented it with the indictment (and the unhinged conspiracy slide), was himself involved with the January 6 riot. A photograph shows him inside restricted zone near the U.S. Capitol building that day, masked to hide his identity, while rioters scaled the Capitol walls behind him.[20]

Mr. Sant intends to file a motion to dismiss for selective prosecution that will draw upon, among other things, the disparate treatment of the defendants in this case and those convicted of violent crimes in connection with the January 6 riot, but whose cases were abandoned or convictions vacated at the behest of President Trump's DOJ.

## ARGUMENT

**I.    THE COURT SHOULD REQUIRE THE GOVERNMENT TO SUPPLEMENT ITS INCOMPLETE DISCLOSURES.**

Under Rule 16(a)(1)(E)(i), the government must disclose information "material to preparing the defense," when the defendant asks. This is a low bar. All a defendant needs to do to surmount it is "present[] 'facts which would tend to show that the Government is

---

[20] https://talkingpointsmemo.com/news/exclusive-trump-dojs-top-antifa-prosecutor-marched-with-crowd-on-jan-6

in possession of information helpful to the defense.' " *United States v. W. R. Grace*, 401 F. Supp. 2d 1069, 1074 (D. Mont. 2005) (quoting *United States v. Santiago,* 46 F.3d 885, 894 (9th Cir.1995)).

In addition to Rule 16, *Brady* and *Giglio* require the government to produce all exculpatory and impeachment evidence in its possession. Because the materials Mr. Sant seeks are discoverable under both Rule 16 and *Brady/Giglio*, as discussed below, the Court should require their disclosure.

### A. The Court should require the government to produce all reports related to surveillance of Minnesota unions, non-profit organizations, protesters and activists.

The government has produced ROIs that "summarize" HSI's covert activity for the weeks in December and January before HSI opened Operation Puppet Master. *See* Exs. 12, 23, 26. It is unclear if these ROIs reflect all the covert activity undertaken during these two months, or just select activity memorialized because it discusses subjects and targets of the two investigations. Given the number of UCAs, however, and the significant date gaps in these summaries, it appears that there is additional surveillance and covert activity during that time period that has not been disclosed. Further, ROIs generated after the investigations formally opened document at least four different UCAs operating in the protester and activist community, with minimal ROIs attributable to some of those UCAs, which suggests additional surveillance activities were being conducted and documented that have not been produced.

ROIs of government surveillance of protesters and activists during Operation Metro Surge not yet disclosed are relevant to Mr. Sant's motion for selective prosecution and

21

outrageous government conduct, as they constitute additional evidence of DHS targeting individuals based on their political beliefs and First Amendment protected conduct. This is so regardless of whether these materials were compiled as part of Operation Puppet Master and Project Whipple Shield or some other investigation.

Further, such materials directly contradict the sworn testimony of Agent Garcia, who told the grand jury that "no one is ever investigated or looked at or even researched on for First Amendment protected activities" by DHS, and that "every single individual that [DHS has] investigated there is a criminal predicate to why we're investigating them . . . ." Ex. 4 at 214:23-215:8. At minimum, any evidence of DHS surveillance of protesters or activists, absent some "criminal predicate," is evidence that could be used to impeach Agent Garcia or other testifying agents at trial. Finally, these materials are classic *Brady* evidence that could be used to attack the quality, nature, and bias of the government's investigation. Any such materials should be produced.

### B. The Court should require the government to produce the withheld Project Whipple Shield ROIs.

The government admits withholding at least five Project Whipple Shield ROIs from the initial disclosures: ROIs 20, 41, 104, 112, and 133. Counsel requested that the government produce these missing ROIs, but the government refused, stating: "We have reviewed these for release and have determined that these are not applicable to *Sant et al*. They are not related to any of these 15 defendants or any of the allegations in the indictment. They relate to a separate investigation that is on-going and we cannot disclose." The government did not explain how these documents could "relate to a separate

22

investigation" when they were designated as reports of activity in the Project Whipple Shield investigation. Regardless, because these ROIs relate to investigation of protesters, activists, and organizations, they are relevant to Mr. Sant's selective prosecution and outrageous government conduct motions and material to his defense for the reasons stated above. They should be produced.

**C. The Court should require the government to produce reports generated pursuant to CUC Operation Keyhole.**

The case opening report for Operation Puppet Master states: "This case has also been accepted under CUC Op Keyhole." Ex. 1 at 2. The operation name itself is troubling, evoking as it does a government that spies on its citizens through their keyholes. Equally troubling is the absence from the disclosures of any documentation regarding the approval, authorization, scope or purpose of Operation Keyhole, let alone the production of any related ROIs. Again, these materials are relevant to Mr. Sant's upcoming motions to dismiss. They are materials that could be used to impeach Agent Garcia or any other testifying agent. And they are classic *Brady* material that could be used to attack the quality and character of the government's investigation as a whole.

**D. The Court should require the government to produce all of the Clearview AI reports it generated of protesters and activists during Operation Metro Surge.**

HSI employed Clearview AI as an investigative tool in this case. *See, e.g.,* Ex. 30. The government has produced only two Clearview AI search results related to Project Whipple Shield and Operation Puppet Master. The report generated for Mr. Sant includes results "accepted" as matches to Mr. Sant that are clearly not him. For example, Page 8 of

the Clearview AI results for Mr. Sant contain photos of another man and his family, including the man's pregnant wife and young daughter, pulled from that man's Facebook page and now inextricably linked with Mr. Sant in HSI's internal databases. Ex. 30 at 8.

The use and abuse of Clearview AI to compile a photo dossier of Mr. Sant and others – especially uncharged protesters and activists – is relevant to Mr. Sant's selective prosecution and outrageous government conduct motions. It also constitutes impeachment evidence regarding the shoddy nature of the investigation and the imprecision of the agents' perceptions and work product. It should be disclosed under both Rule 16 and *Brady/Giglio*.

**E. The Court should require the government to produce internal communications related to Operation Puppet Master and Project Whipple Shield.**

The government's initial disclosures reflect that HSI and DOJ embarked on an improper investigation of First Amendment protected activity without any suggestion that the investigation's targets had committed any crime. Indeed, HSI undercover officers seemingly sought to manufacture a basis for prosecution where no crimes had been committed. To the extent that any investigation was commenced for an improper purpose, any evidence of that improper intent is exculpatory under both *Brady* and *Giglio*, and is highly relevant to potential motions to dismiss for outrageous government misconduct, entrapment, and potential suppression motions.

Further, communications documenting the decision to surveil Minnesotans, seek labor union financial records, and charge this case, are directly relevant to Mr. Sant's selective prosecution and outrageous government conduct motions. Finally, any such evidence is material to presenting a defense if this matter proceeds to trial.

Accordingly, the government should be ordered to produce:

1) All communications between DOJ prosecutors in this District and DOJ in Washington regarding the decisions to begin this investigation or to pursue this prosecution;

2) All communications between anyone within DOJ and other members of the executive branch related to this investigation and prosecution;

3) All communications between and among federal law enforcement agencies regarding any decisions that suggest they were motivated by political purposes or targeted their investigative activities at protected First Amendment speech or activity;

4) All agent rough notes or work product that disclose any improper motivation to commence this investigation or to target investigative activities based on protected First Amendment speech or activity.

### F. The Court should require the government to produce DOJ and DHS communications related to the charging decisions, defendant self-surrender, and doxxing in the AFO cases.

The Court should require the government to fulfill the discovery obligations it squirmed out of by voluntarily dismissing the AFO cases. The communications behind those charging decisions – and the premeditated, highly damaging doxxing of the exonerated defendants – are relevant to Mr. Sant's upcoming motions to dismiss and material to his defense for all the reasons stated above.

### G. The Court should require the government to produce downloads of all UCA "undercover phones" and "undercover laptops."

Finally, UCA 9843 refers in the ROIs to her "undercover phone" and her "undercover laptop." *See* Exs. 31, 32. The government has not made available the download of UCA 9843's "undercover phone," nor has it made available the download of her "undercover laptop." It has not made available any other UCAs' undercover phones or

25

laptops. The contents of the UCAs' "undercover phones" and "undercover laptops," to the extent those contents relate to this case or other investigations of protesters, activists, and organizations during Metro Surge, are directly relevant to and material to the preparation of Mr. Sant's defense and should be disclosed.

## CONCLUSION

For the above-stated reasons, Defendant Isaac Sant respectfully requests that the Court grant his Motion for Discovery.

Respectfully submitted,

DATED: August 13, 2026

/s/ Kevin C. Riach
Kevin C. Riach, #389277
125 Main St. SE, Suite 339
Minneapolis, MN 55412
Telephone: 612.203.8555
kevin@riachdefense.com
*Attorney For Defendant*

26