UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 26-115 (KMM/DTS)

UNITED STATES OF AMERICA,

Plaintiff,

v.

ISAAC SANT, ET AL.,

Defendants.

**GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANT'S MOTION FOR DISCOVERY UNDER RULE 16 AND *BRADY/GIGLIO* (ECF 212)**

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Special Assistant United States Attorney Sommer Honeycutt, hereby consolidates its response and objects to the Defendants Motion for Discovery Under Rule 16 and Brady/Giglio (ECF 212).

## INTRODUCTION

The Defendants jointly moved for a wide breadth of discovery under Rule 16, *Brady*, selective/vindictive prosecution, and outrageous government conduct. Their arguments are based on unbounded extrapolation of current events and complaints about the scope and length of the investigation by agents. The Defendants request—without any limitation as to scope, time or geography—the following: 1) All communications between DOJ prosecutors in this District and DOJ in Washington regarding the decisions to begin this investigation or to pursue this prosecution; 2) All communications between anyone within DOJ and other members of the executive branch related to this investigation and prosecution; 3) All communications between

and among federal law enforcement agencies regarding any decisions that suggest they were motivated by political purposes or targeted their investigative activities at protected First Amendment speech or activity; 4) All agent rough notes or work product that disclose any improper motivation to commence this investigation or to target investigative activities based on protected First Amendment speech or activity. However, the Defendants have not met their burden for production under Rule 16, *Brady* or the high burden of proving entitlement to discovery for selective or vindictive prosecution or outrageous government conduct.

**RESPONSE**

The Court should deny the Defendants' motion for several reasons. First, the defendants have failed to show that their extraordinarily broad discovery requests are "material to preparing the defense" under Rule 16. In any case, Rule16(a)(2) specifically excludes from the government's discovery obligations under Rule 16(a)(1)(E) the production of reports, memoranda, or other internal government documents made by an attorney or agent in connection with investigations or prosecutions. Second, the Defendants have not made a preliminary showing that the requested information is materially exculpatory under *Brady*. Third, and finally, the defendants have not met their burden of making a threshold showing of selective prosecution, vindictive prosecution, or outrageous government conduct. Courts are cautious in considering selective prosecution claims as it calls for the judiciary to exercise power over the charging decisions of the executive branch, as such, the threshold is a demanding one. *See United States v. Armstrong*, 517 U.S. 456, 464

(1996). Outrageous Government is a rare court ruling reserved for only a narrow band of "most intolerable government conduct." *United States v. Pardue*, 983 F.2d 843, 847 (8th Cir. 1993) (internal quotations omitted); *United States v. William Bonne,* 437 F.3d 829, 841-2. (8th Cir. 2006). The Defendant's large-scale suppositions and allegations fail to meet both standards in this case as they offer no real allegations of personal enmity and the scope of the investigation is commensurate with the criminal conduct being investigated.

Further, in their filing, the Defendants misrepresent the Government's evidence. The Government now responds point by point to rebut the mischaracterizations. It should be also noted at the start that the government has engaged the defense in good faith, provided almost entirely open discovery, and provided *Jencks* materials well before they were ordered or due. *See generally* 18 U.S.C. § 3500 (providing that Jencks material need not be disclosed until after the witness has testified on direct examination).

a. **Analyst Garcia did not argue that AFL-CIO, the Minneapolis Federation of Educators, the Minnesota Association of Professional Employees, Monarca, Veterans for Peace, and the Grease Pit bicycle repair shop were part of any overarching conspiracy.**

The Defense referenced HSI Analyst Garcia's grand jury testimony explaining a slide that contained several small icons representing organizations with lines drawn to a box representing Direct Action Minnesota or DAMN. *See ECF 212, Ex. 3.* The Defense concluded that "the government apparently believes – and certainly told the grand jury – that if any individual was connected to both DAMN and any of these entities, the government considers the entities to be conspiring." ECF No. 212 at 6.

Analyst Garcia testified that the slide was a "snapshot of some of the other organizations that members are affiliated with that kind of comprise and make up DAMN." *See G.J. Tr., 27.* Analyst Garcia was not alleging that those other entities were conspiring with DAMN. Instead, his testimony is consistent with the language of the indictment, which reads "3. DAMN is comprised of members from several sub-groups, such as the Black Cat Worker's Collective ("BCWC"), Ray Rainbolt Memorial Shooting Club, and other organizations." ECF No. 1 at ¶ 3. In fact, other than the small icons on page 5 of the grand jury exhibit, there were no questions or testimony about the AFL-CIO, the Minneapolis Federation of Educators, the Minnesota Association of Professional Employees, Monarca, Veterans for Peace, or the Grease Pit bicycle repair shop at any point during the grand jury presentation. The grand jury transcripts are completely devoid of any reference to any of those organizations. *See generally GJ Tr.; ECF No. 212, Ex 3.* The indictment contains one mention of the AFL-CIO and that is a direct quote from defendant Erik Davis from a "TCDA" Signal group message. *Id.* at ¶ 9, OA 11 ("We're all in for 1/23. We have some initial plans, but also a few challenges. So, especially if you have connections to AFL-CIO leadership or decision-makers, PLEASE ASK THEM TO FOCUS ON WHIPPLE AND NOT DOWNTOWN…").

Analyst Garcia did not reference the word "union" in his grand jury testimony. Other than a direct quote from defendant Callum Robinet (*see Id.* at ¶ 9, OA 227), there is no reference to the word "union" contained on the indictment.

By contrast, Analyst Garcia referenced the Black Cat Worker's Collective at least 40 times and the Ray Rainbolt Shooting Club at least 20 times during his grand jury testimony. *See generally GJ Tr.* Analyst Garcia simply noted the different groups that DAMN members belonged to. He did not allege that the groups refenced by the Defense were part of the conspiracy. Instead, Analyst Garcia's testimony was heavily focused on the involvement of Black Cat Worker's Collective and Ray Rainbolt Shooting Club members in DAMN.

b. **The investigation into DAMN began well before January 28, 2026.**

The Defense claims that "on January 28, 2026, just four days after agents murdered Alex Pretti, HSI official[sic] opened its mass spying campaign, which it called 'Operation Puppet Master." ECF No. 212 at 3. The Defense argues that after the death of Alex Pretti, Associate Deputy Attorney General Aakash Singh "directed federal prosecutors to aggressively charge protesters in Minnesota." *Id.* at 17. He continued that "on January 28, 2026, DHS and the U.S. Attorney's Office put Singh's direction into action. In one day, DHS both initiated "Operation Puppet Master." *Id.* The defense claims Associate Deputy Attorney General Singh's statements were made in "late January." *Id.* **HSI undercover agents attended meetings on January 11, 2026, and gained access to DAMN Signal chats by January 14, 2026. The indictment includes 83 overt acts prior to January 28, 2026. *See generally* ECF No 1.**

However, HSI's investigation into "individuals engaged in acts of violence, destruction of federal property, intimidation of federal officers and employees, and

attempts to impede federal operations" began in December 2025. *See Ex 1.* Furthermore, HSI's investigation into Twin Cities Direct Action ("TCDA") began well before January 28, 2026. Undercover agents had already infiltrated TCDA by January 11, 2026. ECF No. 1 at ¶ 9, Overt Act (OA) 1-3. At the January 11, 2026, meeting, an unindicted coconspirator created a Signal group chat called "TCDA," in order to plan for a direct action at the Whipple Building on January 23, 2026. *Id.* at ¶ 9, OA 3. Undercover agents were invited and gained access to Signal chat messages involving TCDA members by at least January 14, 2026. *Id.* at ¶ 9, OA 6. DAMN (then called TCDA) members organized and planned for a blockade at the Whipple building in the "TCDA" Signal group chat. *Id.* at ¶ 9, OA 6-7, 11, 16, 21. Defendant Isaac Sant posted a white flyer in the "TCDA" Signal group chat advertising the blockade at the Whipple building. *Id.* at ¶ 9, OA 16. The flyer was shared on the Black Cat Worker's Collective Facebook page. *Id.*

The indictment includes 83 overt acts before January 28, 2026. *Id.* at ¶ 9, OA 1-83. DAMN members took part in the "direct action" that shut down operations at the Henry Whipple Building on January 23, 2026. *Id.* at ¶ 9, OA 1-83.

"Operation Puppet Master" was a "financial investigation to uncover funding sources" for groups providing material support to violent opportunists and agitators providing material support to individuals involved in impeding federal law enforcement. *See* Ex. 2.

The Defense's claims that HSI's investigation into DAMN was prompted by statements from Associate Deputy Attorney General Singh or any other officials is

inaccurate and not supported by the record, which shows the investigation was already underway prior to those statements.

**<u>HSI had ample grounds to begin its initial investigation</u>**

It should be noted that HSI had ample grounds to begin its initial investigation into "individuals engaged in acts of violence, destruction of federal property, intimidation of federal officers and employees, and attempts to impede federal operations." Here is a brief overview of some of the events that formed the catalyst for the investigation into DAMN:

As early as July 31, 2025, Federal Protective Services (FPS) began to get complaints of Whipple employees being aggressively followed. *See* Ex. 3. FPS Officers received reports from 200-300 people—including directors of the VA, maintenance staff, contractors, lawyers and judges—about harassment, being followed, and other aggressive, intimidating, and interfering behavior. *See* Ex. 3. For example, officers received complaints about debris being thrown or placed in the road that could puncture vehicle tires outside of the employee/ICE gate. Screws and 2-piece caltrops have been routinely found on a regular basis. *See* Ex. 3. FPS also received complaints from civilian employees who reported finding tracking devices or air tags on their personal vehicles. *See* Ex. 3[1]

---

[1] One civilian contractor noted being followed three times from Whipple in March 26, 2026, April 10, 2026, and April 7, 2026. *See* Ex. 3A. A Whipple maintenance employee reported being followed on April 29, 2026, and being cut off by the car that resulted in a minor collision. *See* Ex. 3A On May 6, 2026, one high ranking Veterans Affairs employee noted in their report of being followed to FPS that the encounters he has experienced with the followers "demonstrate clear harassment and intimidation acts meant toward me." *See* Ex. 4. He also said saw an uptick in protesting activity outside of the Whipple in approximately June of 2025 and stated he noticed the first violent protestor in September of 2025 and saw an additional increase in December of 2025. The week of January 6th, 2026, the VA were allowed to telework for their safety because of the agitator activities outside of the Whipple

On June 3, 2025, protesters—incorrectly believing there was an ongoing immigration raid—surrounded a joint law enforcement operation on Lake Street, where federal investigators were executing search warrants in a meth and trafficking case.[2] Similarly, on November 18, 2025, federal agents executing a search warrant were surrounded by protesters who began to throw rocks damaging vehicles.[3] Agents had to leave the search early for their own safety.

Jersey barriers around Whipple went up on January 12, 2026. *See* Ex 3A. On March 3, 2026, the Signal chat group called "Renegades" discussed ways to break down, blow up, and use chemical agents on the jersey barriers. Starting on February 13, 2026, and throughout April, Direct Action Minnesota (DAMN) members had in-person meetings at which they discussed actions at the Federal Premium Ammunition facility in Anoka, MN, including discussions of setting

---

building. *See* Ex 4. On March 12, 2026, an immigration judge reported being on high alert and taking different routes home and is afraid of physical harm after being followed. *See* Ex. 5. A deportation officer reported being followed four times starting in March of 2026, to include twice being followed to his home or around his home, at one point his minor son was followed while driving the deportation officer's personal car. *See* Ex. 6.. This same deportation officer was followed the Whipple building to the federal courthouse in Minneapolis twice. *See* Ex. 6. One instance Defendant Morgan was following the deportation Officer, waited for him to leave the courthouse and then stepped in front of hindering him from leaving. Morgan was clearly recording him and then knocked his sideview mirror causing it to fold. The incident was captured on the US Marshals surveillance. One administrative assistant for a non-ICE tenant, was followed February 20, 2026, April 8, 2026, April 10, 2026, April 14, 2026, April 15, 2026, April 17, 2026. *See* Ex. 3A. She relayed she had been followed so many time that she install her own dash camera and home cameras at her own expense. *See* Ex. 7. She described dangerous and aggressive driving habits while following her, switching lanes and cutting people off. She said they didn't seem to be trying to hide the fact that they were following her.

The government intend to present incidents of other commuting/following events at the hearing.

[2] https://alphanews.org/chaos-erupts-on-lake-street-in-minneapolis-as-feds-attempt-warrant-on-drugs-money-laundering/

[3] https://mndaily.com/city/protesters-clash-with-federal-agents-during-immigration-raid-on-st-paul-business/11/19/2025/eicmndaily-com/

off smoke bombs, flares, and fireworks, as well as cutting off the Internet. *See* Ex. 8; *See* Ex. 9; *See* Ex 10.[4]

Coupled with the discussion of the Federal Ammunition action, were discussions of blockading the Anoka County courthouse. *Id*. On May 12, 2026, at a Direct Action MN in-person meeting, members discussed creating a confrontation at the federal courthouse to engage with ICE and other law enforcement. *See* Ex. 11.[5]

Ray Rainbolt worked security for DAMN as early as February 2026, which included stationing sharpshooters on the roof.[6] Other affinity groups held hard security and firearm training associated with TCDA.

---

[4] On April 28, 2026, in an in-person meeting, Members discussed some type of impeding/destruction event the Federal Premium Working Group. Morgan (Willow Tree) stated, ". . .. the idea is that there's like a lot of things being done at the same time to sort of scare the pants off these weapons manufacturers until they shut down operations." *See* Ex. 12. Apland (Tiny) stated "We are on board with Federal Premium, and we are moving around various vehicles, as always, we have a drone that works." *Id*. On April 27, 2026, a Signal chat group dedicated to the Federal Ammunition "FP Working Group" a message posted with a proton drive link containing a document listing Federal Premium working group meeting 7-830PM on April 27, 2026. *See* Ex 8. The note includes brainstorming actions such as setting off smoke bombs at the Federal Ammunition, flares and fireworks as well as cutting off the Internet *Id*.

[5] Sant (Ike) discussed engineering some sort of clash with ICE and Morgan (Willow Tree) responded that the Federal Courthouse downtown has two entrances and exits that are accessible and used by ICE. "They come in through one and come out through another, as far as I've seen" … "let's experiment with commuting." Apland (Tiny) stated a weakness of actions so far is that "we are challenging them on their turf," like at Whipple. Apland (Tiny) stated that part of the purpose of the "experimentation" was "luring them to our turf" and "there, overwhelming them and proposed a "decoy maneuver with the federal courthouse in order to lure them." Ex pages, Bates 00040563.

[6] UCA 9843 attended a group meeting sponsored by TCDA titled "2/15/Guard," and the "purpose was to discuss security protocols for the upcoming meeting on February 15, 2026, at the United Labor Center Building. UCA 9843 attended the meeting virtually. *See* Ex. 13. Defendant Robinet and other unindicted coconspirators took part in the meeting. ECF No. 1 at ¶ 9, OA 97. During the meeting, Robinet discussed "having sharp shooters on the roof of the parking ramp across the street" from a prior TCDA meeting. Robinet noted, "I don't think that's relevant. We don't need to do that this time. We just had no idea what to expect…and that's awesome because that was the most boring job I've ever had in my entire f*****g life." *Id.* Robinet was a member of the Ray Rainbolt shooting club. *See* Ex. 14. UCA 9843 referenced and obtained a manual called "The New Union Defense Guard Training Manual," which was sponsored by the Ray Rainbolt Shooting Club. *Id.*

Following all of those violence and obstructive incidents, the government had a strong interest in investigating the individuals or groups potentially responsible in order to protect government property, government employees, and the public in general.

c. **There was no reference to SPLC, George Soros, or Open Society in Analyst Garcia's grand jury testimony or on the indictment.**

The Defense also argues that Associate Deputy Attorney General Singh "directed U.S. Attorneys' offices to initiate political prosecutions in other districts. He directed prosecutors to investigate and pursue charges against George Soros and his Open Society Foundation. And he pushed the recently announced indictment of the Southern Poverty Law Center in Alabama. The House Judiciary Committee has begun an investigation into that case…"

---

Ray Rainbolt members, such as Robinet, played a prominent role in the operation of DAMN. Like DAMN members, the New Union Defense Guard Training Manual specifically rejects the nonviolent approach. In the manual, it stated "it is extremely unlikely that any revolutionary movement could succeed by using only tactics that are legal (if any ever has, we're not aware of it). Some level of risk is inevitable." *Id.* The manual states, "…a strict adherence to 'nonviolence' on the terms of order is indistinguishable from obedience to the state, and it is something we must ruthlessly reject." *Id.* It continues, "Against a monopoly of violence, we cannot reject the necessity of self-defense when organizing these mass movements to change consciousness, even if violence makes us uncomfortable." *Id.* The manual discussed the use of weapons by members, stating, "Please note that especially when using weapons, how you use them might escalate them into the context of lethal force. You should never strike the head, spine, eyes, or other areas sensitive to damage if you are trying to use the weapon in a less-lethal way…" *Id.* The guidance provided in the manual glorifies and promotes the use of violence as the only way to achieve change. The tactics urged and advocated stand in stark contrast to the thousands of individuals who peacefully protested during Operation Metro Surge.

Robinet noted, "A lot of people like to think about this as just community defense kind of a thing, which I think it's true in some ways, you know, but community defense also means attack, right? Some people are purely here for creating safe….there's also like an inherent militancy into this project and it's all part of like a chain of insurgency." *See* ECF No. 1 at ¶ 9, OA 227.

The Defense neglected to mention that a federal judge denied the SPLC's motion to dismiss the indictment against the group on the grounds of a vindictive prosecution, finding that lawyers for the group "failed to offer some evidence tending to show animus on the part of the prosecutors involved in bringing this case." *See United States v. Southern Poverty L. Ctr., Inc.,* 2026 U.S. Dist. LEXIS 176620 (8th Cir. 2026). Furthermore, there is no mention of the SPLC, George Soros, or the Open Society Foundation contained in either the indictment or in Analyst Garcia's testimony.

d. **Analyst Garcia used even-handed language and did not use any pejoratives to describe the defendants during his testimony.**

The Defense argues that "President Trump and senior administration officials routinely speak of the political left in de-humanizing terms – as 'deformed,' scarred,' and 'filled with ugliness.' The administration has crystallized these sentiments into policies that encourage and authorize political prosecutions like this one. Most notably, in September 2025, President Trump issued National Security Presidential Memorandum 7 ('NSPM-7'), which directs DOJ to prosecute ICE protesters and opponents of the administration. HSI cited NSPM-7 as its authority to open this case."

The Defense fails to show any evidence that these political sentiments motivated the present prosecution. Rather, as is evidenced by the grand jury transcript, Analyst Garcia used neutral language and at no point used any pejoratives when discussing individuals associated with this case. Analyst Garcia

did not reference the "left," "left wing," or anything political in nature about the defendants during his testimony. *See generally GJ Tr.*

Furthermore, Joint Task Force Vanguard was created after the issuance of NSPM-7 and is tasked with "targeting individuals and organizations engaged in political violence."[7] Joint Task Vanguard cases are neutrally enforced and involve both left- and right-wing violence and threats.[8]

d. **The Defense references financial records for organizations that were not discussed during Analyst Garcia's grand jury testimony, were not included on the indictment, and which the government does not intend to use at trial.**

Analyst Garcia made only passing reference to the Sunrise Movement and Minnesota 50501 due to a statement made by defendant Isaac Sant at a DAMN meeting on February 13, 2026. The Defense argues that "fueled by visions of this vast and irrational conspiracy, HSI surreptitiously obtained financial records of labor unions and non-profit organizations as part of a 'financial investigation' into 'domestic terrorist financing.' ECF No. 212 at 7-8. The Defense concluded "the broad collection of financial records of labor and social justice advocacy organizations, done in secret and with no articulable criminal predicate, violates both the First Amendment and these organizations' right to financial privacy." *Id.* at 9.

---

[7] https://www.justice.gov/usao-ndfl/pr/tennessee-man-federally-indicted-politically-motivated-arson-under-joint-task-force

[8] https://www.justice.gov/usao-ndfl/pr/tallahassee-man-sent-federal-prison-sending-multiple-threats-kill-president-and (Individual convicted for various federal charges stemming from threats made to President Trump, Congressman Eric Swalwell, and Former Federal Reserve Chairman Jerome Powell); https://www.justice.gov/usao-wdnc/pr/south-carolina-man-charged-hate-crime-allegedly-defacing-multiple-buildings-charlotte (Man charged with hate crime for vandalizing multiple buildings at Charlotte Jewish Complex).

Analyst Garcia did not mention "SEIU," "Service Employees International Union," "Communications Workers of America," "CWA," or "Voice for Racial Justice" during his grand jury testimony. The indictment does not reference any of those organizations as well. Overall, the indictment does not cover the funding sources of DAMN or other entities. Other than brief references to the defendants' discussions of a GoFundMe account (*see* ECF No. 1 at ¶ 9, OA 127-131, 134, 137, 140), Analyst Garcia did not testify to the funding mechanisms for DAMN.

Analyst Garcia's grand jury testimony was primarily focused on the planning, coordination, and execution of direct actions and commuting operations by the defendants. The referenced financial records were part of HSI's "financial investigation to uncover funding sources" for groups providing material support to violent opportunists and agitators providing material support to individuals involved in impeding federal law enforcement. *See* Ex 2. The referenced financial records bear minimal, if any, relevance to the current indictment. However, since they were administratively tagged under the same case number, the government disclosed the records to the Defendants in an abundance of caution.

The threshold for administrative investigative subpoenas is if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant. *See U.S. v. Morton Salt Co.,* 338 U.S. 632 (1950), Grand jury subpoenas do not even have a threshold of probably cause. *See United States v. R. Enterprises*, 498 U.S. 292 (1991) ("In short, the Government cannot be required to justify the issuance of a grand jury subpoena by presenting

evidence sufficient to establish probable cause, because the very purpose of requesting the information is to ascertain whether probable cause exists.").

See *also* 18 U.S. Code § 3486; *see also* Congressional Research Service, "Administrative Subpoenas in Criminal Investigations: A Sketch," pages 1-2 (Dec. 2012).

The Defense complains that agents surveilled, investigated, and obtained records for the Sunrise movement, but there were legitimate law enforcement purposes to do so. On February 2, 2026, UCA 9843 attended a group meeting sponsored by the Sunrise. *See* Ex 15. At the meeting, UCA 9843 attended an "actions breakout" meeting. During the action's session, attendees discussed wanting to have an "escalated event" within the next two weeks. Some of the ideas discussed included blockades, shining lasers into agent's eyes, and putting trackers on agent's vehicles. An individual told the group this was a bad idea and could lead to arrest but brought up an idea about possibly doing a blockade at a hotel.

Similarly, UCA 9883 attended a Sunrise meeting on February 2, 2026, and attended a breakout group titled "actions." *See* Ex 16. The group discussed "yellow," "orange," and "red" actions. The group leader described most actions taken by Sunrise as "yellow," but they wanted to get into actions that were "red." The group leader described "red" actions as those that could lead to arrest, such as blocking the road to the Whipple Building or conducting a "Wide Awake" protest at a hotel during hours that were in violation of noise ordinances.

On February 24, 2026, UCA 9883 attended a virtual meeting sponsored by Sunrise. *See* Ex 16. During the meeting, attendees discussed a "red action" on March 27, 2026, that would take place at a hotel known to house ICE agents. The attendees discussed barricading the hotel parking lot so that ICE agents would not be able to go to work. However, during the meeting, there were no attendees committed to doing the red action.

Furthermore, in January 2026, a Sunrise Movement member repeatedly made posts to her own Instagram account and the Sunrise Movement Instagram account describing their efforts to target Hilton Hotels. She said that "ICE, in order to operate, has to sleep somewhere…" *See* Ex 17.

There clearly was a legitimate law enforcement reason to investigate the Sunrise Movement based on its members' statements that, at a minimum, are relevant to a potential conspiracy to obstruct and impede federal law enforcement.

Importantly, this current case is not about the Sunrise Movement. Analyst Garcia made passing reference to the Sunrise Movement and 50501 due to its being referenced in a statement made by defendant Isaac Sant at a DAMN meeting on February 13, 2026. *GJ Tr.118-119; see also* ECF No. 1 ¶ 9, OA 100. Analyst Garcia testified that Sant stated he had just come from a meeting with organizers from Minnesota 50501 and Sunrise. *Id.* Analyst Garcia went on to describe Minnesota 50501 as "a nonprofit kind of activist group…they engage in a lot of different First Amendment protected activity. And in this instance, they were – somebody from that organization was in communication with DAMN." He described Sunrise as "another

nonprofit organization…it's a youth activist organization that promotes types of protests and First Amendment activity. They also do engage in some unlawful activity where there's a number of instances where unlawful assemblies have been declared and individuals from their organization arrested."[9] At no point did Analyst Garcia allege that the Sunrise Movement or Minnesota 5051 were conspiring with DAMN. There is one reference on the indictment to Sunrise and Minnesota 50501 and it is based on a quote from defendant Sant.

Despite the Defense's claims, the financial records for the referenced organizations played no role and bears no relevance to the indictment in this case. Relevant to this case and indictment, Analyst Garcia and the indictment do not include any references to the SEIU, CWA, and Voices for Racial Justice. Analyst Garcia made passing reference to the Sunrise Movement and Minnesota 50501 due to a statement made by the defendant Isaac Sant at a DAMN meeting on February 13, 2026. Information derived from the referenced subpoenas was not included on the indictment and the government does not intend to use it at trial. While not included on the case or the indictment, the records were provided to the defense in an abundance of caution and a sign of good faith.

d. **DAMN members repeatedly discussed plans and logistics for blockading the Whipple Building at different meetings and were ultimately successful at doing so on two occasions.**

[9] https://www.latimes.com/environment/newsletter/2024-09-24/column-climate-protesters-arrested-outside-kamala-harris-brentwood-home-boiling-point (Sunrise Movement activists placed scorched couch cushions from a house burned in the Airport fire outside Vice President Kamala Harris' home in Brentwood. Sunrise Movement activists arrested.); https://www.commondreams.org/news/2021/06/28/sunrise-activists-arrested-over-no-climate-no-deal-blockade-white-house (Sunrise activists arrested in 2021 in "No Climate, No Deal" blockade of White House.)

The Defense argues that "undercover HSI agents ("UCAs") posing as protesters or activists surveilled community meetings at churches, parks, libraries, union halls, schools, and restaurants." ECF No. 212 at 9. The UCAs gained access and were members of DAMN and attending meetings for organizations that they are investigating is a standard law enforcement practice.

It is "well settled that the government may use artifice, stratagem, and undercover agents in its pursuit of criminals." *United States v. Vavra,* 127 F.4th 737, 744 (8th Cir. 2025) (citing *United States v. Myers*, 575 F.3d 801, 806 (8th Cir. 2009). The Fourth Amendment does not protect "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Hoffa v. United States*, 385 U.S. 293, 302 (1966). It is also well settled that a law enforcement agent may record conversations between himself and another party without violating the Fourth Amendment. *See United States v. White*, 401 U.S. 745, 752 (1971); *Lopez v. United States*, 373 U.S. 427, 439 (1963).

The Fourth Amendment does not categorically prohibit a law enforcement agent from gaining entry into places—even private homes—by misrepresenting his identity. *United States v. Wagner*, 884 F.2d 1090, 1094-1095 (8th Cir. 1989) (citing *Lewis v. United States*, 385 U.S. 206, XXX (1966)). As the Eighth Circuit explained in *United States v. Shigemura*, 682 F.2d 699 (8th Cir. 1982), one who consents to an undercover agent's entry into his house "has no legally enforceable expectation that the agent is not an undercover police officer." *Id.* at 706.

In this case, undercover agents investigated and recorded DAMN participants at different locations because they were actively conspiring to impede law enforcement officers at these meetings. Undercover agents first made contact with DAMN (then TCDA) members at a January 11, 2026, meeting. ECF No. 1 ¶ 9, OA 1-3. DAMN members openly discussed targeting the Whipple Building on January 23, 2026, with hard and soft blockades. As noted above, undercover agents were a part of the "TCDA" Signal group chat by at least January 14, 2026. *Id.* ¶ 9, OA 6. DAMN members commonly discussed and planned for direct actions to impede and obstruct federal officials at the Whipple Building and elsewhere. HSI investigated and identified DAMN members that took part in the blockade that shut down the Whipple Building on January 23, 2026. ECF No. 1 ¶ 9, OA 29-69. By January 23, 2026, HSI and law enforcement had ample reason to believe that DAMN members were conspiring to commit (and committing) crimes. HSI undercover agents, therefore, had a legitimate law enforcement purpose for infiltrating and surveilling DAMN as an organization. Furthermore, following the meetings on January 11 and January 19, 2026, HSI knew that DAMN members openly discussed their efforts to obstruct and impede law enforcement.

The Defense notes that undercover agents were present during DAMN meetings at "churches, parks, libraries, union halls, schools, and restaurants." ECF No. 212 at 9. He argues that these individuals were only engaged in "First Amendment speech in a church meeting room." *Id.* at 11. However, it is not First Amendment speech to conspire to impede and obstruct federal immigration and law

enforcement officers. The DAMN participants at these meetings as discussed and planned criminal conduct:

<u>February 1, 2026 "TCDA Propaganda and Communications" Team Meeting at Prince of Peace Lutheran Church</u>

During this meeting, defendant Cameron Kennedy referred to himself as a revolutionary anarchist and discussed coordinating propaganda with effective direct action to help supply materially. ECF No. 1 ¶ 9, OA 86. Kennedy discussed operating a blockade on his street that stops ICE vehicles. *Id.* ¶ 9, OA 87. Blockades to disrupt and stop ICE vehicles are not First Amendment protected speech and are clearly relevant to a conspiracy to impede and obstruct law enforcement officers.

<u>February 13, 2026 TCDA "Vetted" Members Meeting on East 26th Street in Minneapolis</u>

During this meeting, defendant Kim collected participants' cell phones and walked them to a room in the back. *Id.* ¶ 9, OA 99. Defendant Sant relayed to the participants that other groups requested the assistance of TCDA in organizing a blockade at the eastern entrance of Gate 3 of the Whipple Building. *Id.* ¶ 9, OA 100. These statements relate to the March 1, 2026, blockade at the Whipple Building, which successfully shut down operations. The statements are relevant to the conspiracy to obstruct and impede federal law enforcement officers.

<u>February 15, 2026 Meeting Sponsored by TCDA, Black Cat Worker's Collective, Ray Rainbolt Memorial Shooting Club, Socialists Alternative, and Other Organizations at the Untied Labor Center in Minneapolis</u>

During this meeting, participants discussed medical, firearms, and hard security training. *Id.* ¶ 9, OA 106. Participants began planning for another blockade

of the Whipple Building on March 1, 2026. *Id.* Defendant Isaac Sant proposed organizing another blockade at the east entrance of the Whipple Building similar to the January 23, 2026, direct action. *Id.* Again, the participants organizing and planning a blockade to shut down federal law and immigration enforcement operations at the Whipple Building is not First Amendment protected speech. It is directly relevant to the conspiracy to impede and obstruct law enforcement officers.

<u>February 17, 2026 TCDA Meeting on Pleasant Avenue in St. Paul (attach</u>

During this meeting, participants discussed the structure of TCDA as well as the planned March 1, 2026, blockade of the Whipple Building. *Id.* ¶ 9, OA 111. Defendants Van de Water Davis and Sant discussed coordinating and logistics for a "hard blockade" for March 1, 2026. *Id.* ¶ 9, OA 114-115.

<u>February 27, 2026 Shield Training at Zion Community Commons in St. Paul</u>

During the meeting, participants discussed "wedge" tactics that are often utilized at direct actions to obstruct law enforcement and de-arrest individuals. *Id.* ¶ 9, OA 173. Defendant Doyle stated, "…fighting with the fascists rather than just going at them just chest to chest with no shields, if you have a shield wall, you are going to be more effective and much more safe than they are…Take your strongest, heaviest, fastest most aggressive people and put them at the point of that wedge…have your strongest people pushing through…" *Id.* Defendant Sant proposed, "Find two scrawny looking cops and get between…and in that case, somebody just used an umbrella as a wedge…and just parted the two cops." Those

statements are highly relevant to the charged conspiracy to impede and obstruct federal law enforcement.

Once it came to light that DAMN (then TCDA) members were conspiring to blockade and obstruct federal law enforcement officers at the Whipple Building, HSI undercovers were fully justified in infiltrating and surveilling its members in order to pursue and investigate criminal activity. *Vavra,* 127 F.4th at 744.

e. **The government did not target and investigate the thousands of peaceful protesters who took part in the general strike on January 23, 2026.**

The Defense argues that "on January 19, 2026, UCA 9843 attended an in-person meeting at the La Dona Cerveceria restaurant in North Minneapolis at which planning was done for the general strike and protest march that occurred in Minneapolis on January 23, 2026, and was attended by tens-of thousands of protesters. The ROI describes it as 'a general discussion on the upcoming walk out on ICE event being held on January 23. This planning meeting was classic First Amendment protected speech and conduct." ECF No. 212 at 11-12.

The referenced meeting followed the January 11, 2026, meeting and involved members of the Black Cat Worker's Collective. At the January 11, 2026, meeting, TCDA and Black Cat Worker's Collective meetings discussed a planned blockade of the Whipple Building on January 23, 2026. ECF No. 1 at ¶ 9, OA 1-3. Furthermore, HSI undercover agents had infiltrated the "TCDA" Signal group chat, in which there were discussions about the blockade. Also, on that same day, the Black Cat Worker's Collective public Facebook page advertised "DIRECT ACTION TO SHUT DOWN

ICE" and listed the date as January 23, 2026. *Id.* at ¶ 9, OA 20. UCA 9843 had a legitimate law enforcement purpose in further investigating and attending a meeting held in a public place that was attended by Black Cat Worker's Collective members.

f. **Commuting operations as outlined in the indictment goes well beyond any First Amendment protected activity.**

The Defense argues that "UCAs routinely surveilled individuals engaged solely in First Amendment protected activity, including the Whipple Watch group that engaged in peaceful observation of ICE vehicle activity in and out of the Whipple Building – conduct that both Judge Menendez and Chief Judge Schiltz have confirmed it not unlawful. ECF No. 212 at 11.

The government concedes that peaceful observation of ICE vehicles in and out of the Whipple Building, and safely following ICE vehicles to observe them, does not violate the law. However, that is not what took place in this case. DAMN members utilized "commuting tactics," which often involved members following suspected law or immigration enforcement officers to their personal residences. ECF No. 1 at ¶ 5. DAMN members and other individuals often mistakenly stalked and followed federal employees or workers with no connection to immigration or law enforcement. Commuting tactics as utilized by DAMN members often crossed the line into the criminal realm.

For example, on May 4, 2026, defendant Isaac Sant followed an ERO officer from the Whipple Building across state lines into Wisconsin as the officer drove back to his residence after work. *Id. at* ¶ 9, OA 246-248. This goes well beyond simply recording or documenting an officer performing his official duties.

Furthermore, DAMN members do this for the purpose of harassing officers to prevent them from effectively performing their duties. Defendant Sant stated:

> Now in April and we have it down to a science and it's instantaneous. We maintain a searchable database in conjunction with data collection group called Defrost that's publicly searchable on a website…Defrost is the list of every vehicle that we've ever seen ICE in make and model plates and like where and how many times it's been spotted…So what we've started to experiment with now is we maintain a second database that's only current plates. We erase it at the end of every night and we refresh it the next morning…and hot dishes is just a database of like all the active plates that left Whipple that day. So commuters can know like what we're, we have confirmed on the road at the moment….What we do is, I mean we have a two fold motive of like getting their plates and blasting those out to all the neighborhoods and also just like wasting their time and resources.

*Id. at* ¶ 9, OA 235. Defendant Morgan stated:

> Another part of our rapid response infrastructure that's rather critical is relays. Just for context, like ICE is an entirely car-based operation. They're driving from one place to another and they're driving fast. So they rarely stay in one place for very long. And it's important that when they leave one area and enter another, the area they're entering is alerting so that place's rapid responders and patrollers can address the situation. This is known through relays in each hyper local chat.

*Id*. at ¶ 9, OA 228. Defendant Robinet discussed "rapid response," stating it "is an inherently militant project…this is something with the explicit aim of combating and stopping a federal agent with a gun." *Id.* The purpose of commuting operations as carried out by DAMN members is to harass, exhaust, and impede federal law enforcement officers in the execution of their duties. It is not for the purpose of peacefully observing and documenting law enforcement activities. Defendant Kennedy posted on Facebook, "I encourage you all to think about how to physically stop ICE, disrupt their logistics or otherwise directly impede them in your own life

and find the courage to escalate your tactics to something more confrontational. We need to fight to win, not just for show." *Id.* at ¶ 9, OA 84. All of these statements are relevant to the intent of DAMN members when conducting commuting operations.

Aggravating matters, DAMN members often carried out commuting operations in a reckless manner that risked the lives of themselves, the officers, and the community in general. On May 18, 2026, defendant Rakotz drove a Honda Civic and followed the federal immigration officer from the Whipple Building to the area of Minnesota State Highway 55 and Minnesota State Highway 5. RAKOTZ "brake checked" the officer and "side swiped" the officer's vehicle, causing a collision. *Id*. at ¶ 9, OA 260. The officer's dashcam captured Rakotz following and slamming into the side of his vehicle. There were several vehicles on the interstate at the time of this incident.

Commuting operations as outlined in the indictment went well beyond any First Amendment protected activity, and were not limited to peaceful, legal observations of law enforcement activity. Instead, it involved following officers to their personal residences after hours and ramming vehicles into law enforcement officers vehicles. DAMN members admitted that the purpose of commuting operations "stopping a federal agent with a gun."

g. **The defense argues that the indictment is a political prosecution due to the administration's hostility to the left, however, DAMN members advocate violence and obstruction instead of legal, First Amendment activity.**

The Defense argues that Stephen Miller's "extreme hostility to the political left is at the center of power and policymaking, and so it is no surprise that DOJ and DHS

pursued political prosecutions of administration opponents in Minnesota during Operation Metro Surge. ECF No. 212 at 14.

The Defense correctly notes that "tens-of thousands of protesters" attended the general strike in Minneapolis on January 23, 2026. *Id.* at 11. There are some estimates that up to 50,000 to 100,000 individuals attended the general strike.[10] The vast majority of these individuals engaged in peaceful, lawful First Amendment activity. Rebutting the Defense's claims, the government did not target or investigate these individuals as "political prosecutions of administration opponents." That's because the vast majority of individuals that attended on January 23 were peaceful and engaged in legitimate, First Amendment protected activity.

The same cannot be said for the defendants in this case. In this case, the defendants actively conspired to shut down a federal facility and they were successful on at least two occasions. In fact, DAMN members were openly hostile and critical of individuals who advocated for peaceful, nonviolent protests. Here are just a few examples:

> i. On or about January 13, 2026, defendant Kennedy posted on Facebook "It's going to get much worse and ***non-violent ideology and our politicians aren't going to save us. We need to become ungovernable***. We need to actively resist anyway we can to materially stop the Nazi occupation forces." ECF No. 1 at ¶ 9, OA 4.

> ii. On or about February 5, 2026, defendant Kennedy posted on Facebook "I swear I'm going ***to lose my f*****g mind if I see that 'if 3.5% of the population is committed to peaceful revolution, they win' bulls**t…***It's given far to many well meaning people, a fake a** idea of what it takes to win. It has folks attacking militant elements of the resistance and aiding the state against them because they think violence or even property destruction is counter revolutionary. They could not be more wrong. I want to

[10] https://inthesetimes.com/article/labor-general-strike-minnesotans-ice-protest-trump-cbp

make this as clear as I can: ***YOU WILL NEVER WIN WITH NON-VIOLENCE ALONE. Ever. No one has. No one will. You absolutely need militants to win.*** I'm sorry the world is so cruel but this is the real world, not a f*****g fairytale…" *Id.* at ¶ 9, OA 89.

iii. On or about April 24, 2026, defendant Kennedy posted on Facebook about taking part in an interview with Seattle NPR who were covering the "Breaking the ICE" tour. Kennedy discussed the anti-ICE operations in Minneapolis during the interview, writing "...We make a very strong and compelling case that militant confrontations with ICE are what made our movement explode in numbers, drastically reduce deportation numbers and ultimately get the feds to retreat from operation Metro Surge (we even used graphs depicting the change in deportation rates before and after militant confrontations) in addition to the vast network of mutual aid and decentralized community rapid response networks." ***Kennedy criticized a non-violent approach to opposing immigration enforcement, referring to pacificism as "an anti intellectual blight."*** *Id.* at ¶ 9, OA 242.

iv. On or about January 24, 2026, defendant Wagner posted a video on his Instagram account "kaos.follows," while wearing a bullet-proof vest. Wagner stated, "[I]f you are [caught up], it's time to suit up. Boots on the ground. Nicollet and f*****g 26th. My house is four blocks away. Anywhere between Franklin and Nicollet, and 26th and Nicollet, show up ready to go**. *Okay, no, not talking about peaceful protests anymore. We're not talking about having polite conversations anymore…This is exactly what I said was going to f****** come when we didn't f****** go march on f****** Whipple with guns*.** Sorry but welcome to America 2026 where the Second Amendment is the only thing that's going to keep you f****** protected from literal f****** Nazi gun men that are killing innocent people in the street with impunity. This is not a f****** joke. ***There's nothing fun to chant about it.*** Get your f****** guns and stop these f****** people."

By their own admission and actions, DAMN members dismiss the nonviolent approach to political problems. Their approach and criminal activity is why they were investigated and prosecuted while thousands of peaceful protesters in the Twin Cities were not.

**<u>Selective prosecution</u>**

The burden for the Defendants to request production of the request discovery under a selective prosecution claim is a heavy one at this juncture. *United States v. Parham*, 16 F.3d 844, 846 (8th Cir. 1994). Under the two-prong test in *United States v. Perry*, 152 F.3d 900, 903 (8th Cir. 1998), the Defendants must demonstrate, first, "that others similarly situated to him were not prosecuted," and second, "that the decision to enforce the law against him was motivated by discriminatory purpose." *Id.* The Defendants also must show "that the documents in the government's possession would indeed be probative of these elements." *United States v. Catlett*, 584 F.2d 864, 865-66 (8th Cir. 1978). "[M]ere allegations" of selective/vindictive prosecution "do not authorize a defendant to engage in a fishing expedition." *United States v. Aanerud*, 893 F.2d 956, 960-61 (8th Cir. 1990).

In this district, courts have recognized the government's broad discretion as to initiating prosecutions. *United States v. Hawkins*, No. 24-CR-161 (ECT/DJF), 2024 WL 4972969, at *2 (D. Minn. Dec. 4, 2024). Courts have also held that the defense must provide "clear evidence" that the prosecution violated its duties. *United States v. Hawkins*, No. 24-CR-161 (ECT/DJF), 2024 WL 4972969, at *2 (D. Minn. Dec. 4, 2024) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).

However, courts exercise caution when evaluating selective-prosecution claims. As the Tenth Circuit explained, "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily

susceptible to the kind of analysis the courts are competent to undertake." *United States v. Deberry,* 430 F.3d 1294 (10th Cir. 2005); *see also United States v. Wilson,* 262 F.3d 305, 319 (4th Cir. 2001) ("As was the *Goodwin* Court, we are loathe to invade the zone of prosecutorial discretion without a demonstration of circumstances that clearly justify the presumption of a vindictive motive.")

Much like the Defendant's present motion, the defendant in *United States v. Hendrickson,* 664 F.Supp.2d 793 (E.D. Mich. 2009), used the fact of his publicized protests as a reason to bolster his vindictive prosecution claim. Here the Hendrick's court quoted the Eight Circuit:

> Defendant's theory is *not* that he has been singled out for prosecution solely because he has protested the war and tax policies of the government. Rather, he objects to his prosecution only on the basis that he was selected due to the *publicity* his protests have received. The decision to prosecute, therefore, rests upon the amount of publicity one's protests receive, not upon the exercise of one's first amendment right to free speech. Such a decision is not based upon an impermissible ground but rather serves a legitimate governmental interest in promoting public compliance with the tax laws.

*U.S. v. Hendrickson,* 664 F.Supp.2d 793, 475 (E.D. Mich. 2009) (quoting *United States v. Catlett,* 584 F.2d 864, 868 (8th Cir.1978); *see also Schehl v. Commissioner,* 855 F.2d 364, 367 (6th Cir.1988) ("holding that the IRS could properly have selected a vocal "war-tax resister" for administrative enforcement measures and the imposition of civil penalties in order to promote greater compliance with the tax code").

The Defense argues that "as DOJ prosecuted Minnesota protesters, it was vacating and dismissing the last remaining January 6 convictions…Mr. Sant intends to file a motion to dismiss for selective prosecution that will draw upon, among other

things, the disparate treatment of the defendants in this case and those convicted of violent crimes in connection with the January 6 riot, but whose cases were abandoned or convictions vacated at the behest of President Trump's DOJ." ECF No. 212 at 19-20. Likewise, the Defendant in *McIver*, a congress woman, claimed selective prosecution in comparison to the defendants of January 6th; a comparison the court rejected. *United States v. McIver,* 809 F. Supp. 3d 221, 245 (D.N.J. 2025).

Further, the defendant in *McIver* sought discovery even if her vindictive prosecution claim failed. Much like the Defendants in *Sant et al*, McIver asked for similar discovery as in the present case:

> . . .communications over a six-month period referring to the incident in question or discussing the Defendant, the Mayor, or the Representatives' oversight visit. Defendant seeks these communications between "the prosecution team" which she defines as including but not limited to the Attorney General, the Deputy Attorney General, the Assistant Attorney General for the Criminal Division, the Interim or Acting U.S. Attorney for the District of New Jersey, the DHS Secretary, Deputy Secretary, General The Defense, and their staff, in addition to all members of ICE leadership and members of their staff."

*Id* at 254.

The court disagreed and found McIver has not shown credible evidence of similarly situated individuals and has not shown any evidence of her vindictive prosecution claim. *Id*. Much like the Defendant's present motion, the McIver's court noted that the Defendant supported her vindictive prosecution argument with presidential statements that were not particularized to her or her policy positions. *Id*. "Guided by these principles," the Court writes, it "cannot find that Defendant's

broad request for communications among top DOJ, DHS, and ICE officials beginning on January 20, 2025, is warranted for her selective enforcement claim." *Id.*

The court in the Southern Poverty Law Center (SPLC), came to a similar result and denied the SLPC's motion for vindictive prosecution and discovery request. *United States v. S. Poverty L. Ctr., Inc.,* No. 2:26-CR-139-ECM, 2026 WL 2280675, at 1 (M.D. Ala. Aug. 7, 2026). Not only must the defendant show the prosecutor had genuine animus towards them but that the prosecution would not have occurred but for the animus. *Id.* at 6. While *Sant et al.*, involves physical actions, the Defendants claim this prosecution rests on retaliation against the Defendant's exercise of free speech. The court in *SPLC* notes that in the context of the First Amendment, a defendant must show evidence of prosecution but for the exercise of free speech rights. *Id*. The court noted that SPLC's claim rested on a "pattern of Executive Branch conduct" in the case, "that is, the purported opening, closing, and reopening of a "moribund" investigation into the SPLC—as producing the requisite "'realistic likelihood' of vindictiveness." *Id* at 9. The court also found that while SPLC was engaged in protected free speech, heavily criticizing the administration, "if that were sufficient to warrant a presumption, then the Government's fears would be realized, (*see* doc. 68 at 9), and an entity could effectively immunize itself from prosecution simply by engaging in protected speech, such as criticizing political figures and their policies." *Id* at 10. Further, the SPLC court held, the motives of the specific prosecutor's office, and not the administration, are central to this claim. The court writes:

> . . . The motivations of the United States Attorney's Office for the Middle District of Alabama that are central and not, say, those of members of Congress. *See United States v. Gilbert*, 266 F.3d 1180, 1187 (9th Cir. 2001) ("In all but the most extreme cases, it is only the biases and motivations of the prosecutor that are relevant."

*Id*. at 10

Despite criticism of Republican members of Congress, the court found that the SPLC still failed to link that animus to those prosecutors making the actual charging decisions." *Id.* "Without more, the Court will not impute these legislators' expressed criticism of the SPLC to the United States Attorney for the Middle District of Alabama. *Id*. at 10–11.

The Defendants also rely on *United States v. Abrego Garcia*, a case where the court found vindictive prosecution. *United States v. Abrego Garcia*, No. 3:25-CR-00115, 2026 WL 1454303, at 3 (M.D. Tenn. May 22, 2026). However, in that case prosecutors revived an investigation from 2022, and indicted in 2025 using the 2022 evidence as the basis. The case then turned on the fact that evidence was discoverable using due diligence long before 2025. *Id*. The *Abrego* court writes,

> The reopening was followed by a public-facing campaign, with the Executive Branch's fingerprints, tying Abrego to the November 2022 traffic stop. The body camera video had existed since the November 2022 traffic stop, but it became public knowledge only after the Supreme Court's decision .United States v. Abrego Garcia, No. 3:25-CR-00115, 2026 WL 1454303, at *4 (M.D. Tenn. May 22, 2026) First, the evidence must have been unavailable to the Government and not subject to discovery with due diligence.

*Id.* at 7.

In this case, the Defendants took actions to *physically* blockade the federal government, arbitrarily, systematically and *physically* stalk government employees

and in some cases hit or struck federal law enforcement. This was done over the course of the months-long investigation in 2026. It is not old evidence and not a revival of a stale investigation. The agents feared safety for federal law enforcement, civilians and potential sabotage of infrastructure. Despite the Defendant's statement that this prosecution rests solely on protected free speech, the discovery and investigation prove otherwise. The investigation in this case was commensurate with actions planned.

**Outrageous government conduct**

The Defendants lastly rely on the doctrine of outrageous government conduct in support of their discovery requests. In this argument, they relay that the size and scope of the investigation amounted to outrageous government conduct, discussing financial subpoenas as an abuse of process and offering an affidavit of a civil injunction case as an exhibit to support their claim.

"Outrageous Government conduct requires dismissal of a charge 'only if it falls within the narrow band of the most intolerable government conduct.'" *United States v. Bugh*, 701 F.3d 888, 894 (8th Cir. 2012) (quoting *United States v. Morse*, 613 F.3d 787, 792-93 (8th Cir. 2010)). "[T]he level of outrageousness needed to prove a due process violation is quite high, and the government's conduct must shock the conscience of the court." *United States v. Williams*, 720 F.3d 674, 686 (8th Cir. 2013); *accord Bugh*, 701 F.3d at 894 (dismissal is appropriate only when "agents' conduct

violates 'that fundamental fairness, shocking the universal sense of justice, mandated by the Due Process Clause of the Fifth Amendment.'").

Indeed, the doctrine of outrageous government conduct is successfully invoked so rarely that some courts consider it "moribund." For example, Judge Posner, writing for the Seventh Circuit, held that:

> . . . We agree with the First Circuit that the doctrine of outrageous government misconduct is moribund. Stillborn might be a better term, for it never had any life; and it certainly has no support in the decisions of this court, which go out of their way to criticize the doctrine. Today we let the other shoe drop, and hold that the doctrine does not exist in this circuit.

*United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995) (citation modified).

The Defendants argument for outrageous government conduct in this case relies largely on the scope of the investigation, including the use of grand jury and administrative subpoenas. But such subpoenas are part of the investigative process. *See* 18 U.S. Code § 3486; *see also* Congressional Research Service, "Administrative Subpoenas in Criminal Investigations: A Sketch," 1-2 (Dec. 2012).[11] The investigation

---

[11] "In an early examination of the questions, the Supreme Court held that the Fourth Amendment did not preclude enforcement of an administrative subpoena issued by the Wage and Hour Administration notwithstanding the want of probable cause. Neither the Fourth Amendment nor the unclaimed Fifth Amendment privilege against self-incrimination was thought to pose any substantial obstacle to subpoena enforcement. Soon thereafter a second case echoed the same message—the Fourth Amendment does not demand a great deal of administrative subpoenas addressed to corporate entities; a governmental investigation into corporate matters may be of such a sweeping nature and so unrelated to the matter properly under inquiry as to exceed the investigatory power. But it is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite, and the information sought is reasonably relevant. The gist of the protection is in the requirement that the disclosure sought shall not be unreasonable. A statute or judicial tolerance, however, may require what the Constitution does not. Nevertheless when asked if the Internal Revenue Service (IRS) must have probable cause before issuing a summons for the production of documents, the Court intoned the standard often repeated in response to an administrative subpoena challenge, the Commissioner need not meet any standard of probable cause to obtain enforcement of his summons. He must show [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within the Commissioner's

revealed that Defendants raised money to support their blockades and other obstructive actions and the subpoenas were tool used to attempt to discern the source of that funding.[12]

The Defendants also use the fact that UCA's infiltrated their chats in support of their claim. In this district, however, courts recognize that:

> Infiltration of a criminal enterprise is a "recognized and permissible means of investigation" that often requires the government agent to employ subterfuge, to participate in the planning of a crime, and even to provide resources for the crime.

*United States v. White*, 2023 WL 5753678, 5 (D. Minn. 2023) (*citing United States v. Sanchez*, 138 F.3d 1410, 1413 (11th Cir. 1998)).

Lastly, the Defendants filed an affidavit and a civil injunction in *New Eng. Synod v. DHS*, Case No. 4:25-cv-40102 (D. Mass), to suggest the investigators went beyond legal boundaries in this investigation. Even assuming that outrageous government conduct could be premised on the violation of a civil injunction, the

---

possession, and [4] that the administrative steps required by the Code have been followed.... This does not mean that under no circumstances may the court inquire into the underlying reason for the examination. It is the court's process which is invoked to enforce the administrative summons and a court may not permit its process to be abused." Congressional Research Service, "Administrative Subpoenas in Criminal Investigations: A Sketch," 1-2 (Dec. 2012).[11] Found at: https://www.congress.gov/crs_external_products/RS/PDF/RS22407/RS22407.5.pdf

[12] Defendant Kennedy purchased a trailer for the January 23, 2026, blockade. *See* ECF No. 1, ¶ 22, ¶ 27, ¶ 55. Kennedy stated the action came with the risk of arrest. ECF No. 1, ¶ 27. Kennedy also rented a 10-foot U-Haul on January 23, 2026. ECF No. 1, ¶ 29. At an April 18, 2026, speaking event, Kennedy discussed the January 23, 2026, blockade action at the Whipple Building using shields at one entrance as the soft blockade. Kennedy stated: "those deployment teams had trailers that they had bought off of Facebook Marketplace for really cheap" ECF No. 1, ¶ 234. Kennedy discussed the raising of funds for January 23, 2026, blockade at a meeting and in meetings and Signal chats for the March 1, 2026, blockade. *See* ECF No. 1, ¶ 85, ¶ 113, ¶ 120, ¶ 127, ¶ 128, ¶ 131. In discussing raising money, Kennedy told Defendant Van Der Water Davis that Kennedy "really appreciate the risk you are taking and of possible support as much obfuscation of your identity as you want/is possible. Hopefully we can reach our goal and pull it before anything really connect with you or us." ECF No. 1, ¶ 131.

Defendants have failed to show that the investigators violated the injunction. *See* ECF 216.The injunction covers "immigration enforcement actions" at certain protected facilities. "Adjacent Protected Facility" is defined "as any building, premises, or other physical facility attached to or adjacent to a Place of Worship that is used by Plaintiffs to conduct activities, such as religious education and religious ministry, that are central to their religious mission." See ECF 216. In the injunction itself, "immigration enforcement action" is defined as "The order issuing the preliminary injunction defines "immigration "any action by [DHS]that is planned, conducted, undertaken, or executed, in whole or in part, to enforce the immigration laws of the United States, including any arrest, seizure, search, interrogation, questioning, interview, or investigation." *See* ECF 216; Preliminary Injunction Order, Doc. 75, *New England Synod v. Department of Homeland Security*, Case No. 4:25-cv-40102-FDS (D. Mass., filed February 13, 2026). However, the church in the present case was not a targeted institution, nor was the use of the church on that day central to its mission. In fact, it was not even a church sponsored event but a meeting for Left Jab, a TCDA meeting for physical training which includes training to obstruct when arrested.[13] Further, the UCA was not engaged in immigration enforcement as defined by the injunction or as set forth in Title 8 of the United States Code. Rather, the investigation related to alleged Title 18 criminal offenses, with ongoing incidents of the indicted conspiracy.

---

[13] December 13, 2025: In Person-Attended-9843 Description: New Member Orientation-Action Training: How to Stop ICE & Build a Revolution, First Universalist Church in Minneapolis, MN hosted by Sunrise, Movement. *See* Ex. 18.

## CONCLUSION

The Defendants jointly moved for a wide breadth of discovery under Rule 16, *Brady* and selective/vindictive prosecution based on a theory of personal animus by the Presidential administration that is anchored in unbound extrapolation of current events, as well as outrageous government conduct based solely on the scope and length of the investigation by agents. The Defendants' broad stroked request for "1) All communications between DOJ prosecutors in this District and DOJ in Washington regarding the decisions to begin this investigation or to pursue this prosecution", is objected to by the Government for the above reasons. Further the government objects to the Defendants' requests for "2) All communications between anyone within DOJ and other members of the executive branch related to this investigation and prosecution; 3) All communications between and among federal law enforcement agencies regarding any decisions that suggest they were motivated by political purposes or targeted their investigative activities at protected First Amendment speech or activity." Lastly, the government objects to the Defendants' request for "4) All agent rough notes or work product that disclose any improper motivation to commence this investigation or to target investigative activities based

on protected First Amendment speech or activity." Therefore, the Government respectfully asks this Court to deny the Defendant's discovery requests.

Dated: 8/21/2026

Respectfully Submitted,

DANIEL N. ROSEN

United States Attorney

*/s/ Sommer Honeycutt*

BY: SOMMER HONEYCUTT
Special Assistant U.S. Attorney
600 U.S. Courthouse
300 S. 4th Street
Minneapolis, MN 55415
MN Attorney Reg: 398667
Sommer.Honeycutt@usdoj.gov
(612) 664-5600