**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

United States of America,

Plaintiff,

v.

Isaac Auman Sant, et al.,

Defendants.

Case No. 26-cr-115 (KMM/DTS)

**ORDER**

---

## INTRODUCTION

In this Court's view, Assistant Federal Defender [redacted] a respected member of the bar, has committed no crime. This observation will likely draw a puzzled look. Yet, it needs to be said, because an ICE Officer, Michael O'Neal, has written a memorandum accusing [redacted] of obstructing O'Neal's attempted arrest of [redacted] client. The United States Attorney's Office (USAO) published O'Neal's accusatory memorandum to members of the federal bar, including [redacted] employer. [redacted] asked the USAO to retrieve and destroy all copies of the memorandum and to affirm that he has committed no crime. The USAO's response fell short of that mark. [redacted] has turned to this court for a remedy.

## BACKGROUND

Non-party movant [redacted] is an Assistant Federal Defender for the District of Minnesota. [redacted] represented a defendant named [redacted] in an illegal-reentry prosecution before the District of Minnesota in April 2026. [redacted] Decl., Dkt. No. 279 ¶¶ 1-2; *United States v.* [redacted] (D. Minn.). [redacted] does not represent, and has never represented, any of the fifteen

defendants charged in this case, *United States v. Isaac Sant*, *et al*., No. 26-cr-115 (D. Minn.) (*Sant* case). [redacted] Decl. ¶ 2; Dkt. Nos. 110-16, 118-122, 127-28, 147, 151, 180, 191, 265, 273. The cases are unrelated.

**I. [redacted] Illegal-reentry Prosecution**

[redacted] was arrested in the Eastern District of California on an illegal-reentry indictment filed in the District of Minnesota on April 9, 2025. [redacted], Dkt. Nos. 1, 10. On September 2, 2025, [redacted] made his initial appearance in Rule 5(c)(3) proceedings in the Eastern District of California. *Id.*, Dkt. No. 10 at 11 ("All parties present. Defendant present and in custody."). The court there ordered [redacted] released on personal recognizance, with pretrial supervision and other conditions. *Id.* [redacted] conditions of release expressly authorized him to travel to the District of Minnesota for court purposes. *Id.* at 3.

Immediately upon his release, however, [redacted] was arrested by Immigrations and Customs Enforcement (ICE). Dkt. No. 279-1 at 3. [redacted] remained in ICE custody for more than six months. *Id.* On March 18, 2026, the Honorable Dale Drozd of the Eastern District of California ordered [redacted] released from ICE custody and expressly enjoined ICE from re-arresting him, "absent exigent circumstances," without procedural protections, including notice and a pre-detention hearing before an immigration judge. *Id.* at 10. [redacted] was released from ICE custody on March 19, 2026. Dkt. No. 279-4.

When [redacted] was released from ICE Custody, he failed to promptly notify Pretrial Services in California to begin his release supervision. Pretrial Services issued a violation report finding [redacted] in violation of the terms of his pretrial

release. [redacted], Dkt. No. 12 at 2. [redacted] quickly remedied this violation, reporting to Pretrial Services on April 1, 2026, at which time he was in full compliance with his conditions of release on the illegal re-entry charge. *Id.* At no time did Pretrial Services request judicial intervention.

Following his release from ICE custody, the District of Minnesota scheduled an initial appearance on his illegal-reentry indictment for April 21, 2026, which was re-scheduled for [redacted] 2026, to allow [redacted] sufficient time to travel to Minnesota from California. [redacted], Dkt. Nos. 11, 13. Prior to making his initial appearance in Minnesota, the Government stipulated to amending [redacted] conditions of release to allow him to "not be electronically monitored while . . . traveling between California and Minnesota for the purposes of attending court." [redacted] Decl. ¶ 5; Dkt. No. 279-3 at 1. The Eastern District of California accepted the stipulation and modified [redacted] conditions of release accordingly. [redacted] Decl. ¶ 5; Dtk. No. 279-3 at 4.

Prior to [redacted] initial appearance in Minnesota, the Government notified [redacted] that it would agree at the [redacted] hearing to [redacted] "continued release." [redacted] Decl. ¶ 7; Dkt. No. 279-4 at 2. At the initial appearance, [redacted] confirmed that [redacted] lives in California and had come to Minnesota only because the charge arose here. [redacted] Decl. ¶ 8; Dkt. No. 279-5 at 5 ("Your Honor, it is out of Minnesota. Mr. [redacted] lives in California. He traveled here, and the charge arises from this District."). As promised, the Government agreed at the initial appearance to [redacted] continued release on the conditions already set. [redacted] Decl. ¶ 8;

Dkt. No. 279-5 at 4 (Your Honor. With this one, we'd just ask for the probation's recommendations to be adopted in this matter for release.").

The undersigned issued its written release order that same day. Dkt. No. 279-6. This Court's order authorized [redacted] to travel between California and Minnesota for court, removed the previously-imposed location-monitoring condition, and ordered his release "after processing." *Id.* The court's order *did not* direct [redacted] to report to the U.S. Marshals or to Pretrial Services, nor did it require any additional intake as [redacted] was under pretrial supervision in the Eastern District of California, where he lived. *Id.;* [redacted], Dkt. No. 12.

Following the [redacted] proceeding, [redacted] brought [redacted] to the Federal Defender's Office, got him some food, and then escorted him to the light rail station so he could return to California—as ordered by this Court. [redacted] Decl. ¶ 11.[1]

The following day, the USAO[2] emailed [redacted] about [redacted] case, confirming that [redacted] "made his initial appearance yesterday on an illegal reentry charge," and acknowledging that the case could probably be wrapped up quickly. [redacted] Decl. ¶ 13; Dkt. No. 279-7. [redacted] and the Government continued to litigate

[1] In this Order the Court cites to materials filed in support of [redacted] motion. With regards to official court proceedings, the Court has independently confirmed the accuracy of [redacted] description by reviewing official court records from this district and the Eastern District of California, of which it may and does take judicial notice. *See e.g.*, *Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (noting that courts "may take judicial notice of judicial opinions and public records").

[2] Throughout this Order the Court will refer to the prosecution's office in both this case and [redacted] as the United States Attorney for the District of Minnesota—or USAO—to distinguish that office from the Department of Justice (DOJ), of which it is a part. The Court will refer to DOJ and/or to ICE when necessary to distinguish those agencies from the USAO for the District of Minnesota. The Court refers to "the Government" when it intends to include all relevant agencies.

[redacted] case, jointly moving to vacate a status conference and discussing a Rule 20 transfer of the case to California. [redacted] Decl. ¶ 14; [redacted], Dkt. Nos. 23, 28.

**II. The O'Neal Memorandum**

A different account of [redacted] hearing was documented in an April 29, 2026 Memorandum written by Deportation Officer Michael J. O'Neal. Dkt. No. 279-8. The O'Neal Memorandum (O'Neal Memorandum) is written on official U.S. Immigration and Customs Enforcement stationary and is addressed to ICE Assistant Field Office Director Corey McMahon. *Id.* The USAO inexplicably produced the O'Neal Memorandum in discovery in this case, at which time [redacted] first learned of the memorandum and its contents. [redacted] Decl. ¶ 15.

The O'Neal Memorandum concerns [redacted] representation of [redacted] in the illegal-reentry prosecution and his conduct at this court's hearing. Dkt. No. 279-8 at 2-3. In it, Officer O'Neal accuses [redacted] of deliberately evading arrest by ICE and accuses [redacted] of aiding and abetting him in that evasion. *Id.* The O'Neal Memorandum attempts to justify its accusations by describing the events of [redacted] *Id.* To fully understand this ruling it is useful to quote the O'Neal Memorandum at some length:

> On [redacted] 2026, Deportation Officer (DO) O'Neal attended an initial appearance for [redacted] at the United States District Court District of Minnesota in Minneapolis, Minnesota in front of Chief Magistrate Judge Erickson. . . . I took a seat in the galley and awaited the hearing to start. . . .
>
> I suspected Chief Magistrate Judge Erickson would grant an appearance bond as he had just done in the case of [redacted] even though he had acknowledged on record that [redacted] lived in California. . . . Once court was adjourned, I approached the Prosecuting attorney's [sic], asked if this was a case that ERO was

not to place a detainer with, to which they replied they did not know. I then approached Deputy Marchal [sic] Cassandra Stone and stated I was going to take [redacted] as I knew he is a Reinstate that had just been granted an appearance bond and would be released to the street on conditions set forth by U.S. Probation and Pretrial Services. Deputy Marshal Stone stated that [redacted] . . . would need to report to U.S. Probation and Pretrial Services and I could make an administrative arrest there. Assistant Public Defender [redacted] was listening to the conversation I was having with Deputy Marshal Stone, made eye contact with me, then told his client [redacted] they needed to leave and follow him downstairs. I then left the courtroom with the Marshals to the cellblock where I called SDDO Carey, explained the situation and requested an I-200. I received an email from SDDO Carey with a signed I-200 shortly thereafter.

Upon receiving the I-200, Deputy Marshal Gnitka escorted me to the U.S. Probation and Pretrial Services where we waited for [redacted] arrival. After several minutes, Deputy Marshal Stone approached, asking if [redacted] had reported, he had not, Deputy Marshals Stone, Gnitka, and I approached the window and inquired if anyone had checked in within the past ten minutes, and their response was no. Deputy Marshal Stone then asked specifically if [redacted] had checked in, their answer was again no. Deputy Marshal Stone then returned to the United States Marshals Office to review video and locate [redacted] she observed [redacted] and Assistant Public Defender [redacted] in the public lobby. Deputy Marshals Stone, Gnitka, and I proceeded to the public lobby. Once in the public lobby, [redacted] and Assistant Public Defender [redacted] were not located, assuming they may have made their way to the U.S. Public Defenders Office we walked down the hallway. I glanced outside and noticed Assistant Public Defender [redacted] walking alongside to the right of [redacted] while he wore a backpack on the sidewalk to the West of the Minneapolis City Hall heading South towards the light rail.

. . . I followed [redacted] and Assistant Public Defender [redacted] while wearing plain clothes with no police markings visible. We were stopped at a red light awaiting to cross at the intersection of 3rd Avenue and 4th Street while [redacted] and Assistant Public Defender [redacted] continued South.... Upon arrival to the light rail station between the Minneapolis City Hall and the Hennepin County Courthouse [redacted] and Assistant Public Defender [redacted] were not seen, there were light rail cars in each direction at the time of our arrival, once the cars departed, Assistant Public Defender [redacted]

> [redacted] was seen by himself on the South platform, [redacted] had boarded a light rail car heading East, unknown if it was a green or blue line….
>
> To my knowledge, [redacted] did not make his appointment with the U.S. Public Defenders Office and was aided and abetted from immigration arrest by Assistant Public Defender [redacted]
>
> It must be noted that on my drive home, I contacted Special Agent Brubaker, I inquired about the case, and she stated [redacted] had been in custody in California and released on a Habeas Corpus and made his way to Minnesota to attend an initial appearance. At no time prior to the incident had I been aware of that information.

*Id.* O'Neal was thus unaware that United States District Judge Dale A. Drozd had issued a preliminary injunction on March 18, 2026, expressly prohibiting [redacted] re-arrest, absent exigent circumstances, without notice and a pre-detention hearing before an immigration judge. *Id.* at 3; *see* Dkt. No. 279-1 at 10.

## III. Production of O'Neal Memorandum

On August 20, 2026, the USAO produced the O'Neal Memorandum in discovery in this case. Dkt. No. 279-11. This case has no connection to [redacted] and [redacted] does not represent any of the defendants in this case. On September 4, 2026, [redacted] counsel sent a letter to the USAO demanding that it take corrective action regarding this manifestly improper disclosure. [redacted] Decl. ¶ 21; Dkt. No. 279-9 at 7-8. [redacted] counsel expressed concern that the O'Neal Memorandum had been produced "to myriad defense counsel in a case with which Mr. [redacted] has no connection" and stated that it "exposes a sitting Assistant Federal Defender to public suspicion of criminal conduct, based on an ICE officer's uninformed and erroneous account of a routine, court-authorized event." Dkt. No. 279-9 at 3. Accordingly, [redacted] counsel requested that, by September 18, 2026, the USAO (1) notify all recipients of the O'Neal Memorandum that

it "was produced in error, that its allegations concerning Mr. [redacted] are inaccurate, and that it does not reflect a position of the United States Attorney's Office;" (2) guarantee the return or destruction of all copies of the O'Neal Memorandum; and (3) confirm in writing that these actions had been taken. Dkt. No. 279-9 at 7-8; [redacted] Decl. ¶ 21.

On September 18, the deadline for compliance with [redacted] request, USAO Criminal Chief LeeAnn Bell requested additional time to respond to [redacted] request. [redacted] Decl. ¶ 22; Dkt. No. 279-10. [redacted] counsel agreed to the requested extension, but cautioned that, if necessary, he would file a non-party motion in this case to receive an adequate remedy. [redacted] Decl. ¶ 22; Dkt. No. 279-10.

The USAO did not provide the requested relief. Instead, on September 25, Assistant United States Attorney Tory Sailer sent a letter by email to counsel for the defendants in this case concerning the O'Neal Memorandum. [redacted] Decl. ¶ 23; Dkt. No. 279-11. Neither [redacted] nor his counsel were copied on the letter. Dkt. No. 279-11. The letter stated that the O'Neal Memorandum "references a different defendant on unrelated charges and is neither material nor relevant to your client's case" and therefore "was not within the scope of required discovery." *Id.* at 2. Sailer's letter requested that all counsel return or destroy the O'Neal Memorandum and any "summaries, excerpts, or other data referencing [it]," but did not disavow the accusations of criminal conduct made against [redacted] *Id.* at 3. Rather, it stated, "The O'Neal Memo does not reflect the position of the United States Attorney's Office." *Id.*

[redacted] moved this Court to order the return or destruction of the O'Neal Memorandum and to compel a correction of the record to remedy the insufficiencies of the Government's response. Dkt. Nos. 276, 280, 302. Specifically, [redacted] requests a

judicial finding of not guilty—that, as a matter of law, [redacted] did not aid or abet [redacted] in evading arrest. Dkt. Nos. 276, 280, 302.

Prior to oral argument on [redacted] motion, Minnesota Public Radio (MPR) published a story regarding the motion. Dkt. No. 301-1. The story stated: "In an email to MPR News on Tuesday, an ICE spokesperson writes the agency 'remains committed to upholding the law and conducting all operations with integrity. Obstructing law enforcement is a federal crime.' ICE says it cannot comment further because the case is under 'active litigation.'" *Id.* at 5. As [redacted] counsel observed (assuming the MPR story accurately reported ICE's statement) ICE then, despite all facts to the contrary, continued to assert that [redacted] committed a federal crime. Dkt. No. 301 at 2.

On October 20, 2026, with the battle lines clearly drawn, the court heard oral argument on [redacted] motion. Dkt. No. 304. At the hearing, however, additional information came to light regarding relevant facts and the legal positions of the various stakeholders in this matter. To begin, the USAO admitted it could not fully explain how the O'Neal Memorandum came to be produced in discovery in this case. Hearing Transcript, Dkt. No. 315 at 22-26 (Tr.). The Memorandum, though written on official U.S. Immigration and Customs Enforcement stationary and addressed to Assistant Field Office Director Corey McMahon, is not maintained in any official ICE file. Tr. 22. Rather, Officer O'Neal kept the Memorandum in his own personal file. *Id.* ICE Agent Poppe, who was tasked with collecting ICE records to be turned over to the USAO for potential production in this case, interviewed Officer O'Neal whom he mistakenly believed was a victim in this

case.[3] *Id.* at 22-24. During the interview Agent O'Neal gave Agent Poppe "a whole stack of memos," which included the April 29 Memorandum that is at the heart of this matter. *Id.* at 23. The entire "stack of memos" given to the USAO for review and production was produced to the defendants in this case. *Id.* at 24. The USAO cannot say whether the documents were read by anyone in its office prior to disclosure, despite an established multi-level review procedure within the USAO. *Id.* at 23-26. All the USAO can say with certainty is that it produced the O'Neal Memorandum even though it is not relevant or material to this case. *Id.* at 24, 26-27; Dkt. No. 279-11.

Second, at the hearing the USAO stated that Officer O'Neal's justification for obtaining the I-200 to arrest [redacted] was that [redacted] had missed a court appearance here, which "under INS rules" allows ICE to immediately arrest and remove him. Tr. 30, 34-35. But this rationale appears nowhere in the O'Neal Memorandum. *See* Dkt. No. 279-8. To the contrary, the O'Neal Memorandum states its justification as simply that [redacted] was in the country illegally and was released by this court "to the streets." *Id.* at 2.

Finally, at the hearing AUSA Sailer[4] acknowledged that he had no knowledge of any facts even arguably suggesting that [redacted] had committed a crime and saw nothing in the O'Neal Memorandum that would remotely support charging [redacted] Tr. 31-32.

---

[3] The transcript is not entirely clear what, if any, involvement Officer O'Neal has in this case. Tr. 22-24. AUSA Sailer argued that Agent Poppe confused Officer O'Neal with another Officer. *Id.* at 23-24. Counsel for Defendant Sant, Kevin Riach, suggested Officer O'Neal was involved in the investigation of this case. *Id.* at 42-44.

[4] Neither Criminal Chief LeeAnn Bell nor First Assistant Joseph Teirab appeared at the hearing in order to answer this Court's concerns. *See, generally,* Tr. 6-52. Rather, AUSA Sailer, who had no involvement in the production of the O'Neal Memorandum and holds no management position within the USAO, appeared. *Id.* at 25.

Unfortunately, AUSA Sailer could not so acknowledge on behalf of ICE or DOJ, as distinct from his office. *Id.* at 32-33. Rather, he articulated that it was DOJ's position that ICE can lawfully arrest and remove a person despite the order from a federal judge prohibiting such action. *Id.* at 33-36. Here, despite the order from Judge Drozd enjoining [redacted] arrest, the DOJ asserts it has such authority and is not required to comply with a contrary order issued by a federal court of competent jurisdiction. *Id.* at 36.

## ANALYSIS

### I. Due Process Violation

#### A. Justiciability of [redacted] Motion

The Federal Rules of Criminal Procedure do not expressly authorize an individual to file a motion for relief in a criminal case to which they are not a party. *United States v. Kollintzas*, 501 F.3d 796, 800 (7th Cir. 2007); *United States v. Aref*, 533 F.3d 72, 81 (2d Cir. 2008) ("The Federal Rules of Criminal Procedure make no reference to a motion to intervene in a criminal case.") But federal courts are entitled to "formulate procedural rules not specifically required by the Constitution or Congress" to "implement a remedy for violation of recognized rights." *United States v. Hasting*, 461 U.S. 499, 505 (1983). In fact, courts have recognized a non-party's right to intervene in criminal proceedings where "'a third party's constitutional or other federal rights are implicated by the resolution of a particular motion, request, or other issue during the course of a criminal case.'" *United States v. Collyard*, No. 12-0058, 2013 WL 1346202, at *2 (D. Minn. Apr. 3, 2013) (quoting *United States v. Carmichael*, 342 F. Supp. 2d 1070, 1072 (M.D. Ala. 2004)). For example, courts have permitted non-parties to intervene in criminal proceedings to challenge on privilege grounds a party's request for production of documents, *see, e.g. United States*

*v. Bergonzi*, 216 F.R.D. 487, 492 (N.D. Cal. 2003); *United States v. Cuthbertson*, 651 F.2d 189, 193 (3d Cir. 1981), or to protect other rights implicated by that proceeding. *See e.g., Gravel v. United States*, 408 U.S. 606, 608 n.1 (1972).

Here, the parties to this case have not questioned [redacted] ability to pursue relief in this Court. Nor does this Court. The O'Neal Memorandum was produced in discovery in this case; it is plainly harmful to [redacted] reputation. This Court has plenary authority over pretrial proceedings, including the authority to oversee and manage the conduct of discovery. *See e.g., Rowles v. Curators of Univ. of Mo.*, 983 F.3d 345, 353 (8th Cir. 2020) ("A district court has very wide discretion in handling pretrial discovery. . . ." (quotation omitted)); *Solutran, Inc. v. U.S. Bancorp*, No. 13-cv-2637, 2016 WL 7377099, at *2 (D. Minn. Dec. 20, 2016) ("Further, magistrate judges are afforded wide discretion in handling discovery matters and are free to use and control pretrial procedure in furtherance of the orderly administration of justice." (cleaned up)).

More to the point, [redacted] argues that he possesses a private interest in his "good, name, reputation, honor, [and] integrity." Dkt. No. 278 at 15 (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)). The Supreme Court has recognized this private interest, holding that it is of sufficient importance to trigger procedural due process protections. *Constantineau*, 400 U.S at 437 ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.") Accordingly, courts have held that when the government publicly accuses a private citizen of criminal conduct but does so in a manner that does not afford them an opportunity to respond, the government has violated their right to due process, and courts may grant appropriate relief.

In *United States v. Briggs*, 514 F.2d 794 (5th Cir. 1975), the Fifth Circuit held that when the government identifies uncharged individuals in a manner that injures their reputations it violates their due process rights. As that court explained:

> [t]he grand jury that returns an indictment naming a person as an unindicted conspirator does not perform its shielding function but does exactly the reverse. If the charges are baseless, the named person should not be subjected to public branding, and if supported by probable cause he should not be denied a forum.

*Id.* at 803. Thus, the court in *Briggs* recognized that naming an unidentified coconspirator in an indictment offends due process because the government's interest in so doing is outweighed by the harm caused to the individual accused but not indicted. *United States v. Anderson*, 55 F. Supp. 2d 1163, 1166-67 (D. Kan. 1999) (citing *Briggs* 514 F.2d at 806).

In *In re Smith*, 656 F.2d 1101, 1106-07 (5th Cir. Unit A Sept. 1981), the Fifth Circuit recognized that the *Briggs* rule applied beyond the specific context of grand jury proceedings. As the court stated:

> The government argues that Briggs only forbids the naming of unindicted coconspirators by a federal grand jury. We cannot agree. The point made in the Briggs decision is that no legitimate governmental interest is served by an official public smear of an individual when that individual has not been provided a forum in which to vindicate his rights. We can think of no reason to distinguish between an official defamation originating from a federal grand jury or an Assistant United States Attorney.

*Id.* at 1106.

This Court has jurisdiction over [redacted] motion and [redacted] has standing to bring it and seek redress in this proceeding. ICE has stated that [redacted] has committed a federal crime, stating unequivocally that [redacted] "aided and abetted" [redacted] in evading

ICE arrest. Dkt. No. 279-8. The DOJ, through the USAO, has made that accusation public by disclosing it in discovery in this case—a case in which [redacted] has no role and therefore no opportunity to respond unless he is heard here. The harm to [redacted] is acute because the accusation was made with the imprimatur of the Department of Homeland Security – it was published on official DHS/ICE stationary (even though it was kept out of government files). *Id.*; Tr. 22. Moreover, DOJ, through ICE, broadened the reach of its publication when it repeated its public defamation of [redacted] by commenting on the motion, stating, in reference to [redacted] "[o]bstructing law enforcement is a federal crime." Dkt. No. 301-1 at 5. [redacted] has established injury in fact; his claim is not moot. He therefore has standing to bring this motion, and this Court has the authority to hear it.

**B. Due Process**

The government has violated [redacted] due process rights. In arriving at this finding, the Court applies the persuasive reasoning of *Briggs*, *Smith*, and *Anderson*. Specifically, the Court weighs the government's interest in disclosing the O'Neal Memorandum (and then publicly repeating its unfounded allegation by comment in the press) against the harm to [redacted] from being accused without having a forum in which to obtain vindication.

The government admits it has no legitimate interest in disclosing the O'Neal Memorandum in this case to members of the bar, [redacted] employer, or this court. Tr. 24, 27, 29. In contrast, [redacted] practices daily before this court, both with and against members of its bar. He must inspire trust with his candor, integrity, and respect for the rule of law. He must also instill confidence in those whom he represents. His interest in not having been accused of crimes is substantial and palpable; the injury to his reputation

is concrete. He has suffered a due process violation. The only substantial question before the court is the nature and scope of relief this Court may grant to remedy the government's violation.

## II. Remedy

[redacted] requests this Court: (1) direct the United States Attorney's Office to notify every recipient of the O'Neal Memorandum that the Memorandum was produced in error; (2) expunge from the record all identifying references to [redacted] (3) direct all recipients of the O'Neal Memorandum to destroy all unredacted copies, excerpts, and summaries of the Memorandum, and (4) make a finding that as a matter of law [redacted] is not guilty and did not aid or abet [redacted] in evading arrest, detention, or capture. Dkt. No. 278 at 2; Dkt. No. 302. The Court will address [redacted] discovery requests (1-3 above) first.

### A. Discovery Remedies

The court has broad discretion in administering discovery in criminal matters. *See e.g., United States v. Olivares*, 843 F.3d 752, 757 (8th Cir. 2016); *United States v. Hoeffener*, 950 F.3d 1037, 1043 (8th Cir. 2010). Additionally, Rule 16(d)(1) of the Federal Rules of Criminal Procedure provides that the court may "at any time . . . for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief." Fed. R. Crim. P. 16(d)(1).

In this case, the requested relief is well within the ambit of this Court's authority. Moreover, all interested parties concur in the requested relief. Tr. 9-10, 21, 42.

Accordingly, the Court will order the amended request for discovery agreed to by all interested parties.[5]

In addition, the Court will order an aspect of relief not requested. The O'Neal Memorandum is potential *Brady/Giglio* material in this and other cases. It was given to the USAO as part of a larger file, which this Court has not seen, but which has been produced in discovery. *Id.* at 24. The O'Neal Memorandum—and perhaps other materials produced by the USAO—was kept by Officer O'Neal in a "personal file" rather than as part of an official government record. *Id.* at 22-24. The Court is concerned these materials may be destroyed because they are not official ICE documents. Accordingly, the Court orders the USAO to retain and not destroy any materials it has received in connection with this matter, including but not limited to Officer O'Neal's personal files, until further order of this Court.

**B. Request for a Judicial Finding**

[redacted] asks the Court to make a judicial finding of not guilty—that, as a matter of law, he did not aid or abet [redacted] in evading detention or capture. Dkt. Nos. 278 at 2, 302. [redacted] argues that this Court has the authority to make this finding based on the decisions in *Constantineau*, 400 U.S. at 437; *United States v. Holy Land Found. for Relief and Dev.*, 624 F.3d 685 (5th Cir. 2010); *In re Smith*, 656 F.2d at 1104-07; *Briggs*, 514 F.2d at 797-808; *Anderson*, 55 F. Supp. 2d at 1166-72.

---

[5] By "all interested parties" the Court refers to the government, [redacted] and the fifteen named defendants in this case. Those defendants have objected to a complete claw back of the O'Neal Memorandum and its derivatives, arguing that the material is *Giglio* information to which they are entitled. Tr. 42-45. [redacted] does not object to Defendants' suggestion that the original O'Neal Memorandum be returned or destroyed and substituted with a redacted version thereof. Dkt. No. 302.

These decisions clearly support [redacted] standing to pursue relief in this Court as well as this Court's finding that his due process rights have been violated. *Constantineau*, 400 U.S. at 437 (affirming procedural due process protections of notice and an opportunity to be heard when "a person's good name, reputation, honor or integrity is at stake because of what the government is doing"); *Holy Land Found*., 624 F.3d at 687-88 (acknowledging that third-party movants have a due process right to contest the Government's public naming of them as unindicted co-conspirator and/or joint venturers); *In re Smith*, 656 F.2d at 1107 (finding that the inclusion of a non-party's name in the public record of a guilty plea improperly implicated the non-party in criminal conduct "without affording him a forum for vindication"); *Briggs*, 514 F.2d at 797-806 (finding that uncharged individuals had standing to challenge their naming in an indictment accusing them of criminal wrongdoing because they were entitled to a forum for vindication of their rights); *Anderson*, 55 F. Supp. 2d at 1167 ("[W]hen a motion like this is justiciable, the court must undertake a due process balancing inquiry, balancing the interests of the government in naming unindicted coconspirators against the individual harm that stems from being accused without having a forum in which to obtain vindication.").

However, the Court does not have authority to make a binding judicial finding of not guilty for several reasons. First, there is no pending proceeding to adjudicate [redacted] guilt or innocence. To do so before the Government has had an opportunity to present formal charges, and, if the charges survived a motion to dismiss (which would almost certainly be granted), is premature and beyond the Court's jurisdiction. Moreover, to intercede at this stage and effectively prevent the Government from executing its investigatory powers would violate separation of powers. While it is emphatically the

province of the judicial branch to say what the law is, it is equally emphatically the province of the executive branch to see that the laws be faithfully executed. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 577 (1992) (stating that the executive's "most important constitutional duty" is to "take Care that the Laws be faithfully executed." (quoting U.S. Const. Art. II, § 3)). This includes the power to investigate and bring criminal charges. *United States v. Nixon*, 418 U.S. 683, 693 (1974) ("[T]he Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case[.]"). Finally, the cases on which [redacted] relies do not support the relief requested. *See Anderson*, 55 F. Supp. 2d at 1170-71. Nor do the Federal Rules of Criminal Procedure expressly authorize such a finding as a sanction for the USAO's discovery misconduct. Lastly, for the reasons discussed above, making such a finding it is not within the court's broad authority to control discovery.

That said, however, the Court has reviewed the entirety of the record in this matter and has heard and considered the arguments of counsel. Based on the record before it, there is no probable cause (nor even a reasonable suspicion) to believe that [redacted] committed any crime whatsoever. The Court discusses its analysis of this (and related issues) below.

To begin, [redacted] conduct in this case is entirely consistent with innocence. He brought his client to the Federal Defender's Office, fed him, then walked him to the light rail station so that he could comply with his court-ordered return to California. [redacted] Decl. ¶ 11. There is no evidence that [redacted] rushed his client to the train station, took a circuitous route, used back entrances and/or exits, or engaged in any furtive or suspicious conduct. *Id.* Rather, he walked with his client in broad daylight on a public sidewalk in

plaint sight of, among others, Officer O'Neal and the deputy Marshals with him. *Id.*; *see also* Dkt. No. 279-8.

Moreover, an analysis of the relevant statutes reveals no required criminal intent. The O'Neal Memorandum refers to "aiding and abetting" an evasion of arrest but cites no particular criminal statute [redacted] violated. Dkt. No. 279-8. There are only two likely statutes at issue—18 U.S.C. §§ 1505 and 1071.[6]

18 U.S.C. § 1505 prohibits obstruction of Congressional or administrative proceedings. An individual commits criminal obstruction of justice if he corruptly obstructs or endeavors to obstruct "due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States." 18 U.S.C. § 1505; *see United States v. Hayes*, 329 F. App'x 680, 681 (8th Cir. 2009). Accordingly, an individual is guilty of criminal obstruction if: (1) there was a proceeding pending before a United States department or agency; (2) the individual knew that a particular administrative proceeding was pending; and (3) the individual intentionally corruptly influenced, obstructed, or impeded the pending proceeding, or endeavored to do so. 18 U.S.C. § 1505; *United States v. Price*, 951 F.2d 1028, 1030-31 (9th Cir. 1991); *United States v. Warshak*, 631 F.3d 266, 325 (6th Cir. 2010). An individual acts "corruptly" as used in section 1505 if he "act[s] with an improper purpose." 18 U.S.C. § 1515(b).

---

[6] 18 U.S.C. §§ 111 and 2231 do not apply, as both statutes require the use of force. 18 U.S.C. § 2231 (requiring defendant to have "forcibly" assaulted, resisted, opposed, prevented, impeded, intimidated, or interfered with "any person authorized to serve or execute search warrants or to make searches and seizures . . ."); *United States v. Schrader*, 10 F.3d 1345, 1348 (8th Cir. 1993) (holding that "[f]orce is a necessary element of any § 111 violation"). There is no allegation that [redacted] used force or threatened to use force against Officer O'Neal. *See* Dkt. No. 279-8.

Several circuit courts have held that, as part of the intent element, a "nexus" must exist between the obstructive act and the proceeding in question. *See United States v. Aguilar*, 515 U.S. 593, 599-601 (1995) (construing similar language under 18 U.S.C § 1503); *see United States v. Quattrone*, 441 F.3d 153, 174 (2d Cir. 2006) (applying the *Aguilar* nexus requirement to Section 1505); *United States v. Senffner*, 280 F.3d 755, 762 (7th Cir. 2002) (same); *but see United States v. Bhagat*, 436 F.3d 1140, 1147-48 (9th Cir. 2006) (declining to incorporate a nexus requirement in Section 1505). Under the nexus requirement, to have the "requisite intent to obstruct," the defendant must have knowledge that his actions are likely to affect the administrative proceeding. *Aguilar*, 515 U.S. at 599; *see also United States v. Mitchell*, 877 F.2d 294, 299 (4th Cir. 1989) (noting that "[t]he proper inquiry is whether a defendant had the requisite corrupt intent to improperly influence the [proceeding]"). In other words, the defendant must knowingly have obstructed proceedings.

Courts have further interpreted the term "proceeding" broadly. *United States v. Hernandez*, 173 F.4th 94, 102 (4th Cir. 2026). In fact, the Eighth Circuit has held that investigative activities carried out by an agency are proceedings under Section 1505. *Rice v. United States*, 356 F.2d 709, 713 (8th Cir. 1996). But these administrative investigations differ from traditional law enforcement activities (i.e., police activities). *Id.* at 715 (differentiating between investigative actions taken by the S.E.C and "mere police investigations.") Relying in part on this distinction, the Fourth Circuit recently held that "ICE enforcement proceedings," such as the execution of a removal warrant, are not "pending proceedings" under Section 1505 because they are more akin to law enforcement investigations. *Hernandez*, 173 F.4th at 102. Under this precedent, if

applied, [redacted] even if he intended to assist [redacted] in evading arrest by O'Neal—could not be guilty under § 1505.

Moreover, this section only criminalizes obstruction of "due and proper administration of the law." 18 U.S.C. § 1505. Thus, even ignoring *Hernandez*, and assuming execution of an ICE administrative warrant qualifies under the statute, the plain language of the statute would require that the issuance of the warrant be "due and proper." For reasons discussed further below, this Court would find that the issuance of the warrant in this case was not due and proper.

In turn, 18 U.S.C. § 1071 prohibits harboring and concealing a fugitive from arrest. To establish the elements necessary for a conviction under Section 1071, the government must prove three elements: "(1) the defendant had specific knowledge that a federal warrant had been issued[7] for the person's arrest, (2) the defendant harbored or concealed the person for whom the arrest warrant had been issued, and (3) the defendant intended to prevent the person's discovery and arrest." *United States v. Hayes*, 518 F.3d 989, 993 (8th Cir. 2008); *United States v. Waloke*, 923 F.3d 1152, 1155 (8th Cir. 2019).

"Section 1071 does not proscribe all forms of aid to a fugitive," but rather requires under the second element that the defendant take some "affirmative physical action" to

---

[7]The Eighth Circuit has not determined whether an I-200 administrative warrant constitutes a federal warrant for the purposes of Section 1071. A singular case from the Eastern District of Wisconsin, now on appeal at the Seventh Circuit, has addressed this issue. *See United States v. Dugan*, 829 F. Supp. 3d 536, 546 (E.D. Wis. 2026). In that case, the court concluded that a I-200 administrative warrant does constitute a federal warrant under 18 U.S.C. § 1071. *Id.* (denying the defendant's motion for judgment of acquittal and a new trial because there was sufficient evidence to convict her of concealing an immigrant with the knowledge that an I-200 administrative warrant for the immigrant's arrest had been issued). Regardless, the Court is unaware of any decision finding that an I-200 *unlawfully* issued would qualify under § 1071.

aid the fugitive in avoiding apprehension. *United States v. Zabriskie*, 415 F.3d 1139, 1145 (10th Cir. 2005) (quotation omitted); *see also United States v. Zerba*, 21 F.3d 250, 252 (8th Cir. 1994) (noting that the defendant discussed with fugitive the places that they could "run to avoid the authorities" and drove the fugitive to other places to avoid arrest). In *United States v. Erdman*, the Eighth Circuit quoted the Fourth Circuit in stating that to "harbor or conceal" under the second element is "'any physical act of providing assistance, including food, shelter, and other assistance to aid . . . in avoiding detection and apprehension.'" 953 F.2d 387, 390 (8th Cir. 1992) (quoting *United States v. Silva*, 745 F.2d 840, 849 (4th Cir. 1984)); *see also Zerba*, 21 F.3d at 252 (describing the second element as "[the defendant] engaged in physical acts that aided [the fugitive] in avoiding detection and apprehension").

Thus, the elements of both offenses require [redacted] to have had knowledge of the issuance of the I-200 or at least of Officer O'Neal's intent to arrest [redacted] Nothing in the record establishes probable cause to believe [redacted] knew an I-200 had been issued for his client or was aware of Officer O'Neal's intent to arrest his client. The O'Neal Memorandum asserts that "[redacted] was listening to the conversation [O'Neal] was having with Deputy Marshal Stone, made eye contact with me, then told his client . . . they needed to leave and [to] follow him downstairs." Dkt. No. 279-8 at 2. But, as [redacted] counsel points out, O'Neal is not a mind reader. Tr. 13. Officer O'Neal is simply not competent to say whether in fact [redacted] was listening to his conversation nor what, if anything, [redacted] heard. This is merely his belief, his supposition. [redacted] denies this. In a declaration signed under penalty of perjury, [redacted] testified he "did not overhear, and had no knowledge at the time of [O'Neal's conversation] . . . [and] was not aware . . . of

any plan . . . to administratively arrest" his client. [redacted] Decl. ¶ 12. And why would he even suspect such? He knew [redacted] had been released from ICE custody pursuant to a writ of habeas corpus. [redacted] initial appearance in this district was postponed until his release at which time the USAO here – apparently contrary to DOJ policy – affirmatively agreed to [redacted] continued release on the criminal charges.

Of the two contending arguments – [redacted] sworn declaration and Officer O'Neal's unbridled supposition – the court credits [redacted] and only [redacted] declaration was signed under penalty of perjury and [redacted] was present at the hearing on this issue to testify should the Court have decided further testimony was necessary. *See* [redacted] Decl. at 9; Tr. 8. Officer O'Neal was not present at the hearing and submitted no declaration to explain or justify his supposition. Tr. 20. [redacted] statement is based on his personal knowledge; Officer O'Neal's, on rank speculation. O'Neal's contemporaneous record of his observations is not only unsworn, it is riddled with errors. He refers to the undersigned as Chief Magistrate Judge Erickson. Dkt. No. 279-8 at 2. Chief Magistrate Judge Erickson retired sixteen years ago. He sat in Duluth, not Minneapolis. And, the District of Minnesota has not had a Chief Magistrate Judge in over a decade. O'Neal asserts that [redacted] missed an appointment at the Federal Defender's Office. *Id.* at 3. He did not. [redacted] Decl. ¶ 19. O'Neal was unaware of the order enjoining his intended arrest. Dkt. No. 279-8 at 3. And, the Memorandum contains innumerable typographical and grammatical errors. *Id.* at 2-3. There is no basis on which this Court could or would credit O'Neal's assertion that [redacted] overheard his conversation. [redacted] who is known to this court to be serious, candid, ethical, and

honest, denies this under penalty of perjury. [redacted] Decl. ¶ 12. In short, there is simply no credible evidence that [redacted] had the requisite knowledge of [redacted] imminent arrest to support a charge under either statute. Absent such knowledge, [redacted] could not be found guilty of either offense as a matter of law.

Moreover, the I-200 that Officer O'Neal allegedly possessed (of which there is in fact no evidence before this court) was not lawfully issued for two reasons. First, DOJ claims it had authority to issue the I-200 because [redacted] missed a court appearance in the District of Minnesota. Tr. 30, 35. This factual predicate is wrong. [redacted] was indicted in this district on April 9, 2025. [redacted], Dkt. Nos. 1-3. He was arrested on the indictment in California on August 27, 2025, and made his initial appearance there on September 2, 2025, at which time he was ordered released to appear in Minnesota on September 16, 2025. *Id.,* Dkt. No. 10; Dkt. No. 279-4. Immediately upon his release, however, ICE arrested [redacted] Dkt. No. 279-1 at 3. He could not make the initial appearance that had been set. *Id.* He did not miss a court appearance in Minnesota—ICE procured his absence.[8] As a result, the court postponed the initial appearance indefinitely. [redacted] remained in ICE custody for the next six months until March 18, 2026, when Judge Dale Drozd ordered his immediate release from ICE custody and enjoined ICE from re-arresting him, absent exigent circumstances, without notice and a pre-detention hearing. *Id.*

Upon his release from ICE custody [redacted] was required to notify Pretrial Services in California of his release from ICE custody so that he could begin his

---

[8] ICE has not argued that it can procure [redacted] non-appearance, and a year later, use that procured non-appearance to justify his arrest in Minnesota.

supervision as originally ordered by Magistrate Judge Allison Claire. [redacted], Dkt. No. 12. [redacted] reported to Pretrial services on April 1, 2026, less than two weeks after his release from ICE custody. *Id.* Technically, this was a violation of Judge Claire's order setting conditions of release. However, because [redacted] had quickly come into compliance, no judicial intervention was requested or ordered. *Id.* In short, [redacted] did not miss a court appearance in California, and he quickly rectified his circumstances with supervision.

At the time he commenced supervision in California, [redacted] was notified of his next court date in the District of Minnesota, April 21, 2026, for which [redacted] was "actively working on travel arrangements." *Id.,* Dkt. Nos. 11-12*.* However, [redacted] had a pre-existing appearance in immigration court in California scheduled for April 22, 2026. Because he needed to travel to Minnesota by train, [redacted] requested a continuance of the April 21 appearance date. *Id.*, Dkt. Nos. 11, 13. All parties agreed to a one-week continuance, as did the court. *Id.* He did not "miss" a court appearance on the 21st; he acted responsibly by rescheduling it with everyone's knowledge and consent.

Nor did [redacted] miss his court date on [redacted] 2026. He was present, as this court, all counsel, and even Officer O'Neal can attest. Dkt. No. 279-5. The factual predicate for the issuance of the I-200—that [redacted] missed a court appearance—did not exist. Nor had [redacted] fled from supervision in California—he was court-ordered to appear in Minnesota. And he did.

Moreover, ICE's ostensible reason for issuance of the I-200 is not only factually wrong, it appears fictional in another sense. O'Neal's ostensible reason for securing the

I-200 while sitting in the courtroom on [redacted] – that [redacted] missed a court appearance – appears nowhere in his contemporaneous Memorandum. In fact, the Memorandum says otherwise. It says that he secured the I-200 because he knew [redacted] was in the country unlawfully (based on the charge) and he feared that this court would release [redacted] to the street (where he would presumably vanish and avoid removal). Dkt. No. 279-8. The justification for issuance of the I-200 offered for the first time at the hearing on [redacted] motion appears to be an after-the-fact concocted rationalization. Regardless, there was no factual basis for the issuance of the I-200.

Moreover, arresting [redacted] would have violated Judge Drozd's order enjoining ICE from arresting him. *See* Dkt. No. 279-1 There were no exigent circumstances; O'Neal provided no notice; there was no pre-detention hearing. At the hearing on this motion, AUSA Sailer argued in a dual role. On behalf of the USAO, Sailer acknowledged that he saw no basis for accusing [redacted] of a crime. Tr. 31-32. But he distinguished the USAO's position from DOJ's and ICE's. *Id.* at 31-37. Wearing his DOJ hat, he argued ICE need not comply with a federal court order enjoining it from arresting and removing a person. *Id.* at 32-37. ICE, he asserted, has broad authority over matters of immigration and the arrest was authorized under "INS rules."[9] *Id.* at 33-36. In short, DOJ argues a federal court cannot enjoin ICE from exercising authority it has given itself under its own rules. Stated another way, according to DOJ, Judge Drozd's order was either not lawful, or not lawful enough. At the hearing, DOJ described this position as a

[9] Though in fact it was not because [redacted] had not missed his court appearance.

debate between two co-equal branches of government, the executive and the judicial. *Id.* at 34.

As a nation, we've had this fight before—in 1803. As Chief Justice John Marshall observed in *Marbury v. Madison*, 5 U.S. at 177, "[i]t is, emphatically, the province and duty of the judicial department, to say what the law is." Judge Drozd determined that [redacted] continued detention violated his constitutional right to due process and enjoined his re-arrest without providing notice and hearing, unless there were exigent circumstances. Dkt. No. 279-1. It is, emphatically, Judge Drozd's province and duty to do so.

DOJ's position that it can willfully disobey a federal court order has been soundly rejected by many courts. To quote Chief Judge Boasberg:

> [I]t is a foundational legal precept that every judicial order 'must be obeyed' – no matter how 'erroneous' it 'may be' – until a court reverses it. *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967). If a party chooses to disobey the order – rather than wait for it to be reversed through the judicial process – such disobedience is punishable as contempt, notwithstanding any later-revealed deficiencies in the order. *See id.* at 314, 320. That foundational 'rule of law' answers not just how this compliance inquiry can proceed, but why it must. *See id.* at 320. The rule 'reflects a belief that in the fair administration of justice no man can be judge in his own case,' no matter how 'exalted his station' or 'righteous his motives.' *Id.* at 320-21.
>
> The Constitution does not tolerate willful disobedience of judicial orders – especially by officials of a coordinate branch who have sworn an oath to uphold it. To permit such officials to freely 'annul the judgments of the courts of the United States' would not just 'destroy the rights acquired under those judgments'; it would make 'a solemn mockery' of 'the constitution itself.' *United States v. Peters*, 9 U.S. (5 Cranch) 115, 136 (1809) (Marshall C.J.). 'So fatal a result must be deprecated by all.' *Id.*

*J.G.G. v. Trump*, 778 F. Supp. 3d 24, 30-31 (D.D.C. 2025) (citations modified), *vacated*, 147 F.4th 1044 (D.C. Cir. 2025). The remedy for the executive branch when it disagrees with a court order is not to simply disregard it, but to appeal it to a higher court, or, if appropriate, to seek redress in Congress.

And Congress has weighed in on the issue of obedience to court orders generally. 18 U.S.C. § 1509 makes it a crime, by threats or force, to willfully prevent, obstruct, impede or interfere with the due exercise of rights under any order, judgment or decree of a court of the United States. Had Officer O'Neal arrested [redacted] he arguably may have violated this criminal statute. An arrest is an obstruction by force of [redacted] exercise of his due process rights under Judge Drozd's order.

It appears to the court that Officer O'Neal recognized the true limits of his authority. Before attempting to execute his ill-gotten I-200, Officer O'Neal asked the duty AUSA whether [redacted] case was a "case that ERO was not to place a detainer with." Dkt. No. 279-8. Moreover, in his memorandum Officer O'Neal seemingly attempts to justify his attempted arrest by documenting his ignorance of Judge Drozd's order at the time of his attempted arrest: "At no time prior to the incident had I been aware of that information." *Id.* at 3. The clear implication being that had he been aware of Judge Drozd's order, he would not have sought the I-200 or attempted to arrest [redacted]

One final aspect of the motion hearing merits comment. AUSA Sailer attempted to reassure the court that as a practical matter [redacted] was not in jeopardy of arrest or prosecution:

> I would also say that it is the position of our office that we do not agree with the outline of the memo, but I am not going to go as far as to say that I agree to the facts as outlined here because I do have – I would have to do an investigation into

> it and determine whether or not this actually factually is true or not. And that's something that I don't see ICE putting forth the resources to determine that. So it seems to me as though they have no interest in it, and our office isn't looking at prosecuting it. That's why I put in the letter: We don't agree with it.

Tr. 37. This suggestion misses the mark.

First, though prosecuting [redacted] is "not the position" of the USAO, positions, and the people who take them, both may change. It is undoubtedly little comfort to [redacted] that he does not face charges *today*.

And that is very problem [redacted] asks this court to remedy. The USAO has put the allegation out there, and ICE has reiterated it. Yet, DOJ refuses to retract it, leaving [redacted] without a vehicle to clear his name. The apple will never get ripe. That is why [redacted] turns to this Court for a finding that he is not guilty as a matter of law.

The Court agrees with [redacted] that based on the facts presented to it there is no probable cause for the accusation that has been made. Unfortunately, this Court can go no further than it has. It cannot make a judicial finding that [redacted] is not guilty as a matter of law. It cannot do so for the very reason that Officer O'Neal cannot defy the order by Judge Drozd. It is the exclusive province of the executive branch to investigate and prosecute crime. The judicial branch cannot prevent DOJ—should it be so venal and foolhardy as to do so—from presenting its "evidence" to a grand jury or filing an information. The undersigned has no doubt that [redacted] could not be successfully prosecuted, should DOJ try. But the court cannot interfere in that process or prejudge it. All it can do is say in no uncertain terms that, in its judgment, based on the record before it, the accusation made against [redacted] is reckless and false. There is no probable cause or even a reasonable suspicion that [redacted] committed any crime.

## FINDINGS OF FACT

Based on all the files, records, proceedings, and arguments of counsel herein, the Court makes the following findings:

1. [redacted] has standing to pursue relief in this court;

2. [redacted] has suffered harm as a result of the disclosure of the O'Neal Memorandum;

3. The government had no legitimate interest in publishing the O'Neal Memorandum;

4. The government has violated [redacted] Due Process.

## ORDER

The Court **GRANTS IN PART AND DENIES IN PART** the Motion as set forth below.

**IT IS HEREBY ORDERED**:

1. Within one week of the date of this Order:

   a. the U.S. Attorney's Office for the District of Minnesota shall notify in writing every recipient of the April 29, 2026 Memorandum captioned "Aid and Abetting," written by Deportation Officer Michael J. O'Neal to ICE Assistant Field Office Director Corey McMahon (the "Original O'Neal Memorandum") that the Memorandum was produced in error;

   b. the U.S. Attorney's Office shall provide a copy of this Order to every recipient of the Original O'Neal Memorandum;

   c. the U.S. Attorney's Office shall provide a replacement for the Original O'Neal Memorandum that is redacted as set forth below (the

"Redacted O'Neal Memorandum") to every recipient of the Original O'Neal Memorandum; and

d. the U.S. Attorney's Office shall certify its compliance with this paragraph to Mr. [redacted] counsel at cmadel@madellaw.com.

2. The Redacted O'Neal Memorandum shall redact Mr. [redacted] name, and any other information that reasonably could identify him (including his title or position), from the Original O'Neal Memorandum and from any excerpt, summary, or description of it before including it in or attaching it to any filing in this action. In any such filing, Mr. [redacted] shall be referred to only as "Mr. Doe."

3. All parties and their counsel, and every other recipient of the Original O'Neal Memorandum, shall replace the Original O'Neal Memorandum with the Redacted O'Neal Memorandum and shall destroy all copies (whether digital or hard-copy) of the Original O'Neal Memorandum and shall certify that they have destroyed all such copies to the U.S. Attorney's Office within 7 days of receipt of the Redacted O'Neal Memorandum.

4. Following receipt of all such certifications from the parties, their counsel, and every other recipient of the Original O'Neal Memorandum (and in no event later than 15 days following entry of this Order), the U.S. Attorney's Office shall provide confirmation to Mr. [redacted] counsel at cmadel@madellaw.com that certifications of destruction of the Original O'Neal Memorandum were received from all parties, their counsel, and every other recipient of the Original O'Neal Memorandum. The U.S. Attorney's Office shall retain all such certifications until further order of this Court.

5. No party or counsel shall mention Mr. [redacted] name in any hearing, trial, or other proceeding before this Court when referring to the Original or Redacted O'Neal

Memorandum or the allegations in it, and shall instead refer to him as "Mr. Doe." Counsel shall advise any witness they call of this requirement before the witness testifies.

6. Within two weeks of the date of this Order, any party that has previously filed the Original O'Neal Memorandum, or any document that identifies Mr. [redacted] in connection with the Original O'Neal Memorandum or the allegations in it, shall file the Redacted O'Neal Memorandum and/or redacted documents in compliance with paragraph 2. The Clerk of Court is directed to seal the unredacted versions of any such filings.

7. Nothing in paragraphs 2 through 6 restricts (a) references to Mr. [redacted] in his capacity as counsel in any matter; (b) filings by Mr. [redacted] or his counsel in connection with the Motion, or (c) the public availability of this Order.

8. The U.S. Attorney's Office shall retain and shall not destroy any materials received from ICE Agent Poppe, including but not limited to any materials provided by Agent O'Neal.

9. The Court retains jurisdiction to enforce this Order.

10. The Motion is denied in all other respects.

Dated: November 13, 2026

s/ David T. Schultz
DAVID T. SCHULTZ
United States Magistrate Judge